2022 CO 2 William Scott Pettigrew, Petitioner v. The People of the State of Colorado. Respondent No. 20SC353
Supreme Court of Colorado, En banc
January 10, 2022
 
 1
 
 
 
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 16CA1319
 
 
 2
 
 
 
 Attorneys for Petitioner: Mulligan & Mulligan, PLLC Casey
 J. Mulligan
 
 
 
 Attorneys for Respondent: Philip J. Weiser, Attorney General
 Megan C. Rasband, Assistant Attorney General
 
 
 
 JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 
 
 OPINION
 
 
 
 JUSTICE GABRIEL
 
 
 3
 
 
 ¶1
 In this case, a companion to Tibbels v. People, 2022
 CO 1, __ P.3d__, which we also announce today, we review the
 court of appeals division's decision in People v.
 Pettigrew, 2020 COA 46, 490 __P.3d 680, in which the
 division affirmed petitioner William Scott Pettigrew's
 judgment of conviction for pandering of a child and tampering
 with a witness or victim. Pettigrew asserts that the trial
 court's statements to the jury venire during voir dire
 lowered the prosecution's burden of proof in violation of
 due process. Additionally, he contends that the division
 erred in determining that a warrant to search his cell phone
 and the warrant's supporting affidavit satisfied the
 Fourth Amendment's particularity requirement. In his
 view, had the courts below properly redacted from the warrant
 all information obtained as a result of his initial unlawful
 arrest, the warrant would not have sufficiently described the
 place to be searched.[1]
 
 
 4
 
 
 ¶2
 We now conclude that, although a number of the trial
 court's comments during voir dire were problematic, on
 the facts presented here, there is no reasonable likelihood
 that the jury would have understood the court's
 statements, in the context of the instructions as a whole and
 the trial record, to lower the prosecution's burden of
 proof below the reasonable doubt standard. In addition,
 assuming without deciding that the warrant and its supporting
 affidavit, when properly redacted, did not satisfy the Fourth
 Amendment's particularity requirement, we conclude that
 any error in admitting at trial the evidence obtained from
 Pettigrew's cell phone was harmless beyond a reasonable
 doubt. This evidence was cumulative of other evidence
 presented, and the evidence of Pettigrew's guilt was
 overwhelming.
 
 
 ¶3
 Accordingly, we affirm the division's judgment, albeit
 for somewhat different reasons.
 
 
 5
 
 
 I.
 Facts and Procedural History
 
 
 ¶4
 Pettigrew met the victim, K.T., in the summer of 2013. At the
 time, K.T. was seventeen years old. Pettigrew and K.T. began
 a relationship, which eventually became intimate.
 
 
 ¶5
 At some point that fall, the two began discussing, in person,
 by telephone, and via text message, an arrangement whereby
 Pettigrew would help K.T. to engage in prostitution with men
 he knew from his work in the oil fields in North Dakota.
 During this period, K.T. also texted several sexually
 explicit photographs of herself to Pettigrew.
 
 
 ¶6
 In January 2014, K.T.'s mother discovered the explicit
 photographs and text messages on K.T.'s cell phone and
 contacted the police. K.T.'s mother turned K.T.'s
 cell phone over to the police, and the police conducted a
 search of that phone and interviewed K.T. multiple times.
 
 
 ¶7
 Later that month, police officers arrested Pettigrew inside
 his home without a warrant, and the officers transported
 Pettigrew to the police station, where a detective questioned
 him. During this interrogation, Pettigrew showed the
 detective some of the text messages on his cell phone.
 
 
 ¶8
 At the conclusion of this interview, the detective seized
 Pettigrew's cell phone and put it into evidence at the
 police station. The police, however, released Pettigrew
 because a supervising officer had concerns about the
 propriety of
 
 
 6
 
 
 Pettigrew's warrantless arrest. Notwithstanding the
 foregoing, the police retained Pettigrew's cell phone
 because they knew that it contained information related to
 the charges that the police were investigating.
 
 
 ¶9
 The next day, the police sought, and a magistrate issued, a
 warrant for Pettigrew's arrest, and the police rearrested
 Pettigrew. The prosecution then charged Pettigrew with, as
 pertinent here, soliciting for child prostitution, pandering
 of a child, sexual exploitation of a child, criminal attempt
 to commit inducement of child prostitution, and tampering
 with a witness or victim.
 
 
 ¶10
 Thereafter, the police obtained a search warrant for
 Pettigrew's cell phone, which was still in police
 custody. This warrant, and the affidavit in support thereof,
 described the place to be searched as follows:
 
 
 [W]hite black Motorola Droid cell phone from the Verizon
 Network with phone number 720-[xxx-xxxx] seized from William
 Scott Pettigrew on 01/23/14 which is in evidence at the
 Brighton Police Department at 3401 E Bromley LN, Brighton[.]
 
 
 ¶11
 The case proceeded, and prior to trial, Pettigrew moved to
 suppress his cell phone and all of the information that the
 police had obtained when they searched it. In support of this
 motion, Pettigrew argued that his initial warrantless arrest
 was unlawful and that the seizure and subsequent forensic
 examination of his cell phone were fruits of the unlawful
 arrest.
 
 
 ¶12
 The trial court subsequently denied Pettigrew's motion,
 concluding that the hot pursuit exception to the warrant
 requirement justified Pettigrew's warrantless
 
 
 7
 
 
 arrest, and therefore the police had validly seized the cell
 phone incident to that arrest. The trial court further
 concluded that the interrogating officer had probable cause
 to seize the cell phone after the officer had been shown the
 phone and its contents during the interrogation. The court
 observed that the phone contained (or could have contained)
 evidence of criminal activity and that returning the phone to
 Pettigrew would have posed a significant risk of evidence
 destruction. The court thus concluded that the police had
 acted properly in retaining the phone until they obtained a
 warrant, at which point they also acted properly in searching
 that phone.
 
 
 ¶13
 The case then advanced to trial, and during voir dire of the
 prospective jurors, the trial court explained what it
 described as some of the principles of criminal justice and
 trial work, to ensure that the prospective jurors understood
 exactly what would be expected of them. Four of the
 court's comments during this process are at issue in this
 case.
 
 
 ¶14
 First, in a discussion with one prospective juror, the court
 clarified the distinction between a verdict of not guilty and
 a finding of the defendant's innocence:
 
 
 THE COURT: Innocent would mean that the defendant didn't
 do anything, all right? He was in China at the time of this
 event, okay? He just-he's innocent, all right? But
 that's not how we look at trials in this country.
 It's-trials in this country are a test of the
 
 
 prosecution's evidence. So even if you listen to the
 evidence and you start to think about it, you say, well, you
 know, he might have done
 
 
 8
 
 
 it, or he could have done it, there's some evidence there
 that would suggest he's involved in this, if it
 doesn't convince you beyond a reasonable doubt, then you
 have to find him not guilty. Does that make sense?
 
 
 THE PROSPECTIVE JUROR: Right.
 
 
 THE COURT: And that's the test of the prosecution's
 evidence. Their burden is to prove to your satisfaction
 beyond a reasonable doubt. But if you were in a situation
 listening to this case and you said, well, I don't think
 that the prosecution's evidence has convinced me, I still
 have a reasonable doubt about the defendant's-whether
 he's guilty or not, but you have some thought, well, but
 he could have done it, he might have done it, if your only
 choices were guilty and innocent, you wouldn't be able to
 return a verdict. Right?
 
 
 THE PROSPECTIVE JUROR: Right.
 
 
 THE COURT: Because part of you would be saying, well, he
 might have done it, so you can't find him innocent, but
 it's-the evidence isn't strong enough, so you
 can't find him guilty. And then you are left without a
 verdict. So we don't do that. We say not guilty means the
 prosecution hasn't convinced you beyond a reasonable
 doubt, regardless of what evidence they introduce. If you
 have a reasonable doubt about the guilt of the defendant,
 then you find him not guilty.
 
 
 ¶15
 Second, the court criticized the pattern definition of
 reasonable doubt:
 
 
 THE COURT: [Reasonable doubt is] pretty hard to define. The
 law tries to give you a definition, and one thing I learned a
 long time ago is you never define a word using the word.
 Right?
 
 
 THE PROSPECTIVE JUROR: Yeah.
 
 
 THE COURT: Unfortunately, the law couldn't come up with
 anything better, so I'm going to read it to you even
 though it's a little inadequate. Reasonable doubt
 means a doubt based on reason and common sense which arises
 from a fair and rational consideration of all of the evidence
 or the lack of evidence in the case. It is a doubt which is
 not a vague, speculative or imaginary doubt, but such a doubt
 as would
 
 
 9
 
 
 cause reasonable people to hesitate to act in matters of
 importance to themselves.
 
 
 (Emphasis added.)
 
 
 ¶16
 Third, after describing the pattern definition of reasonable
 doubt as "a little inadequate," the court provided
 its own example to illustrate the concept:
 
 
 THE COURT: [Prospective juror], I don't want to embarrass
 you, but would you mind telling me what the month and date of
 your birth is?
 
 
 THE PROSPECTIVE JUROR: November 18.
 
 
 THE COURT: November 18. How do you know that?
 
 
 THE PROSPECTIVE JUROR: It's on my birth certificate.
 
 
 THE COURT: It's on your birth certificate, and that's
 an official hospital document, right?
 
 
 THE PROSPECTIVE JUROR: Yes, sir.
 
 
 THE COURT: Now, [prospective juror], this doesn't apply
 to you, but I have read in the paper over the years and heard
 reports that hospitals-some hospital somewhere has actually
 sent the wrong child home with the wrong set of parents. Have
 you ever heard that?
 
 
 THE PROSPECTIVE JUROR: Yes, sir.
 
 
 THE COURT: It's tragic. I mean, it's an absolute
 tragedy when something like that occurs. [Prospective juror],
 I would suggest to you that if a hospital can make a mistake
 of that magnitude, certainly some clerk downstairs in the
 hospital on the date you were born might have made a mistake
 on your birth certificate. Agreed?
 
 
 THE PROSPECTIVE JUROR: Yes.
 
 
 THE COURT: Could have, right? So maybe it isn't
 November-what was it, 18th?
 
 
 THE PROSPECTIVE JUROR: Yes, sir.
 
 
 10
 
 
 THE COURT: Maybe it wasn't November 18. Got anything else
 that convinces you that it was on November 18?
 
 
 THE PROSPECTIVE JUROR: My parents.
 
 
 THE COURT: Your parents. Your parents, right?
 
 
 THE PROSPECTIVE JUROR: Yes, sir.
 
 
 THE COURT: And your mother was there, right?
 
 
 THE PROSPECTIVE JUROR: Yes.
 
 
 THE COURT: Sure. But I would suggest to you, [prospective
 juror], that on your-when you were born, your mother probably
 wasn't thinking of the date. She was probably much more
 concerned with what your father had done to her.
 
 
 THE PROSPECTIVE JUROR: True.
 
 
 THE COURT: Okay? So she might have gotten the date wrong as
 well. Do you understand where I'm going with this?
 
 
 THE PROSPECTIVE JUROR: Yes.
 
 
 THE COURT: I can throw out maybe your birth certificate is
 wrong, maybe your mother wasn't aware of the date. But I
 would suggest to you, [prospective juror], on November 18,
 you are going to recognize that as your birthday, aren't
 you?
 
 
 THE PROSPECTIVE JUROR: Yes, sir.
 
 
 THE COURT: Because I haven't created a reasonable doubt,
 have I?
 
 
 THE PROSPECTIVE JUROR: No, sir.
 
 
 THE COURT: That's the important thing. It's not to
 remove all doubt, every doubt, every vague or imaginative
 doubt. The burden is on the prosecution to remove all
 reasonable doubt.
 
 
 ¶17
 Fourth, in response to a prospective juror's question
 regarding why the prosecution had not charged Pettigrew with
 child pornography, the court stated:
 
 
 11
 
 
 THE COURT: Well, you will just have to listen. Maybe
 there's not enough evidence to charge him with that. I
 don't know what the evidence is going to be.
 
 
 THE PROSPECTIVE JUROR: So, I mean, [wondering why there are
 no child pornography charges is] where my mind's already
 going.
 
 
 THE COURT: I understand. But, first of all, you know, we
 try people when there's evidence to support the charges,
 okay?
 
 
 THE PROSPECTIVE JUROR: Right.
 
 
 THE COURT: You know, and right now he's presumed innocent
 because there's no evidence against him, so I can't
 speak to why he's not being charged with other offenses.
 
 
 (Emphasis added.)
 
 
 ¶18
 After the jury was empaneled, the court further explained the
 trial process.
 
 
 The
 court reminded the jury that Pettigrew was presumed innocent
 and that the prosecution had to prove his guilt beyond a
 reasonable doubt. Emphasizing this point, the court stated
 that Pettigrew had no burden to prove his innocence, call any
 witnesses, or introduce any evidence. Additionally, the court
 told the jury that after the presentation of the evidence in
 the case, the court would provide instructions regarding the
 law that the jury would apply in deciding whether the
 prosecution had proved Pettigrew's guilt beyond a
 reasonable doubt.
 
 
 ¶19
 Thereafter, at trial, the prosecution argued that Pettigrew
 had encouraged K.T. to engage in prostitution by offering to
 connect her with his coworkers in the North Dakota oil fields
 who would pay her for sex. In support of this theory, the
 prosecution presented testimony from K.T. and her best
 friend, C.E., as well as
 
 
 12
 
 
 forensic reports that detailed text messages and photographs
 procured from K.T.'s and Pettigrew's cell phones,
 respectively. K.T. testified that she and Pettigrew had
 discussed the prostitution arrangement on multiple occasions,
 over text, by telephone, and in person, and that the plan was
 for Pettigrew to act as "a pimp" by finding people
 for K.T. to sleep with among the "[o]il field men"
 that he knew. K.T. further testified that Pettigrew told her
 that he would protect her and that she could make $300 per
 hour having sex with the oil field workers.
 
 
 ¶20
 During K.T.'s testimony, the prosecution also introduced
 a forensic report produced from data stored on K.T.'s
 cell phone that detailed text message exchanges between K.T.
 and Pettigrew in which the two discussed the prostitution
 arrangement. This report included sexually explicit
 photographs that K.T. had sent to Pettigrew, at his request,
 via text message, three of which K.T. sent in the context of
 a conversation regarding the prostitution arrangement. The
 forensic report did not indicate the presence of any problems
 with the transmission of these text messages or photographs
 from K.T.'s cell phone to Pettigrew's cell phone.
 
 
 ¶21
 To corroborate K.T.'s testimony, the prosecution called
 C.E., who testified that K.T. and Pettigrew had come up with
 a plan whereby K.T. and C.E. would go over to Pettigrew's
 house and have sex with his oil field friends for money. C.E.
 explained that, as part of this plan, Pettigrew would be the
 one to bring his oil field friends over. Additionally, C.E.
 testified that K.T. had texted her some of the
 
 
 13
 
 
 details of the plan, specifically that they could make $300
 per hour prostituting themselves.
 
 
 ¶22
 The prosecution also introduced three forensic reports
 produced from information on Pettigrew's cell phone.
 These reports, which compiled text messages and photographs
 that Pettigrew and K.T. had exchanged during the time period
 at issue, generally matched the report produced from
 K.T.'s phone, although the analysis of Pettigrew's
 phone reflected that he had retained some but not all of the
 photographs that K.T. had sent him. The detective who
 prepared the reports testified that he believed Pettigrew had
 received all of the photographs but that Pettigrew may have
 subsequently deleted some of them, because nothing indicated
 that an error had occurred when K.T. sent the photographs to
 Pettigrew and the program used to create the particular
 report did not extract deleted data from the phone.
 
 
 ¶23
 At the close of the evidence, the trial court correctly
 instructed the jury on the prosecution's burden of proof
 and on the presumption of innocence afforded defendants in
 criminal cases. The jury ultimately convicted Pettigrew of
 pandering of a child and tampering with a witness or victim
 but acquitted him of the other charges.
 
 
 ¶24
 Pettigrew appealed, arguing, among other things, that (1) the
 above-quoted statements that the trial court had made during
 the jury selection process had
 
 
 14
 
 
 lowered the prosecution's burden of proof and (2) the
 court had erred in admitting evidence from Pettigrew's
 cell phone because the police had obtained that information
 in violation of Pettigrew's Fourth Amendment rights.
 Pettigrew, ¶ 1, 490 P.3d at 683.
 
 
 ¶25
 In a unanimous, unpublished order, a division of the court of
 appeals rejected the trial court's conclusion that the
 hot pursuit exception to the warrant requirement justified
 the police officers' entry into Pettigrew's home and,
 in turn, validated the subsequent seizure of Pettigrew's
 cell phone incident to Pettigrew's arrest. People v.
 Pettigrew, No. 16CA1319, slip op. at 9 (Feb. 27, 2019).
 The division, however, proceeded to consider whether the
 independent source exception to the Fourth Amendment's
 exclusionary rule separately applied to justify the trial
 court's admission of the evidence obtained from
 Pettigrew's cell phone. Id. at 11, 14. After
 redacting from the warrant affidavit the information that the
 division believed the officers had obtained as a result of
 Pettigrew's unlawful arrest, the division concluded that
 the affidavit still established probable cause to believe
 that Pettigrew's cell phone would contain relevant
 information. Id. at 15-16. The question thus became
 whether the initial search of the cell phone tainted the
 detective's decision to seek the warrant. Id. at
 16. The division concluded that this question required
 additional factual findings and thus remanded the case for
 further proceedings. Id.
 
 
 15
 
 
 ¶26
 On remand, the trial court found that the detective's
 decision to seek a warrant for Pettigrew's cell phone was
 not prompted by the evidence that the police had obtained as
 a result of the initial illegal arrest. The court therefore
 concluded that the evidence from Pettigrew's cell phone
 was admissible under the independent source exception.
 
 
 ¶27
 The matter was then recertified to the court of appeals, and
 a different division addressed and rejected Pettigrew's
 contentions on their merits. Specifically, as to
 Pettigrew's argument that the trial court's
 statements to the jury during voir dire improperly lowered
 the prosecution's burden of proof, the division concluded
 that they did not, regardless of whether they could be
 considered formal instructions to the jury.
 Pettigrew, ¶¶ 13-28, 490 P.3d at
 684-86. As to Pettigrew's contentions regarding
 the warrant, the division concluded that (1) the
 detective's decision to obtain a search warrant for
 Pettigrew's cell phone was not affected by the illegally
 gathered evidence; and (2) even after redacting from the
 warrant the cell phone's physical description, which
 Pettigrew claimed was discovered solely as a result of his
 initial unlawful arrest, the warrant satisfied the Fourth
 Amendment's particularity requirement because it
 "authorized the search of Pettigrew's cell phone
 that was tied to one specific phone number."
 Id. at ¶¶ 36-43, 490 P.3d at 687-88. The
 division thus affirmed Pettigrew's judgment of
 conviction. Id. at ¶ 47, 490 P.3d at 688.
 
 
 16
 
 
 ¶28
 Pettigrew thereafter petitioned this court for a writ of
 certiorari, and we granted his petition.
 
 
 II.
 Analysis
 
 
 ¶29
 We begin by considering whether the trial court's
 statements during voir dire effectively lowered the
 prosecution's burden of proof in violation of due
 process, and we conclude that they did not. We then turn to
 the search warrant issue and conclude that even if the
 warrant did not satisfy the Fourth Amendment's
 particularity requirement, any error in admitting evidence
 from Pettigrew's cell phone was harmless beyond a
 reasonable doubt.
 
 
 A.
 Trial Court's
 Statements During
 Voir Dire
 
 
 ¶30
 We begin our analysis of the trial court's statements to
 the prospective jurors by addressing our standard of review.
 We then address the applicable law, discussed more fully in
 Tibbels, ¶¶ 23-43, which we also announce
 today, and we apply those principles to the facts before us.
 
 
 1.
 Standard of Review
 
 
 ¶31
 We review de novo the question of whether a trial court
 accurately instructed the jury on the law. Johnson v.
 People, 2019 CO 17, ¶ 8, 436 P.3d 529, 531.
 Instructions that lower the prosecution's burden of proof
 below the reasonable doubt standard constitute structural
 error and require automatic reversal. Id.;
 accord Sullivan v. Louisiana, 508 U.S. 275, 281-82
 (1993).
 
 
 17
 
 
 ¶32
 We note that the People argue that the trial court's
 statements to the jury in this case did not amount to
 instructions and instead were merely comments to the venire
 that we should review for plain error because Pettigrew did
 not object to them. For the reasons set forth in
 Tibbels, ¶¶ 37-43, we need not determine
 whether the court's statements here rose to the level of
 formal jury instructions because the test for determining
 whether a court has properly instructed the jury is a
 functional one that accounts for the content and context of
 the statements at issue with reference to the instructions as
 a whole and the trial record. By its very nature then, the
 test encapsulates consideration of the contested
 statements' form and function, which removes the need to
 determine, as a preliminary matter, whether the court's
 statements to the jury constituted formal instructions.
 
 
 2.
 Applicable Law
 
 
 ¶33
 The Due Process Clause of the United States Constitution
 "protects the accused against conviction except upon
 proof beyond a reasonable doubt of every fact necessary to
 constitute the crime with which he is charged." In
 re Winship, 397 U.S. 358, 364 (1970); accord Vega v.
 People, 893 P.2d 107, 111 (Colo. 1995). The Supreme
 Court has thus made clear that the reasonable doubt standard
 is "indispensable" in criminal prosecutions.
 See Winship, 397 U.S. at 364. ¶34 Intrinsically
 related to this standard is the presumption of innocence
 afforded criminal defendants. See Delo v. Lashley,
 507 U.S. 272, 278 (1993) (per
 
 
 18
 
 
 curiam) (observing that the presumption of innocence
 "operates at the guilt phase of a trial to remind the
 jury that the State has the burden of establishing every
 element of the offense beyond a reasonable doubt"). As
 the Supreme Court has stated, "The [reasonable doubt]
 standard provides concrete substance for the presumption of
 innocence-that bedrock 'axiomatic and elementary'
 principle whose 'enforcement lies at the foundation of
 the administration of our criminal law.'"
 Winship, 397 U.S. at 363 (quoting Coffin v.
 United States, 156 U.S. 432, 453 (1895)).
 
 
 ¶35
 In light of the foregoing, the court must properly instruct
 the jury on-and, as the fact finder, the jury must apply-the
 reasonable doubt standard. Johnson, ¶ 13, 436
 P.3d at 533. In this regard, trial courts retain some
 flexibility in defining for the jury what constitutes a
 reasonable doubt. Id. at ¶ 10, 436 P.3d at 532;
 see also Victor v. Nebraska, 511 U.S. 1, 5 (1994)
 ("[S]o long as the court instructs the jury on the
 necessity that the defendant's guilt be proved beyond a
 reasonable doubt, the Constitution does not require that any
 particular form of words be used in advising the jury of the
 government's burden of proof.") (citation omitted).
 Nonetheless, both this court and the Supreme Court have
 repeatedly cautioned that attempts by trial courts to define
 "reasonable doubt" in ways beyond the
 long-established pattern instructions seldom clarify the
 term, see, e.g., Holland v. United States,
 348 U.S. 121, 140 (1954); Johnson, ¶¶ 13,
 19, 436 P.3d at 532, 534, and
 
 
 19
 
 
 that trial courts must guard against defining
 "reasonable doubt" in a way that allows the jury to
 convict on a lesser showing than due process requires,
 see Victor, 511 U.S. at 22; Johnson, ¶
 13, 436 P.3d at 532. The trial courts' decisions not to
 heed this admonition in both this case and in
 Tibbels, ¶¶ 10-13, have again placed
 before us the question of whether a trial court's efforts
 to define "reasonable doubt" violated a
 defendant's due process rights.
 
 
 ¶36
 As discussed at greater length in Tibbels,
 ¶¶ 2, 26-43, 59, to determine whether a trial court
 incorrectly instructed the jury as to the reasonable doubt
 standard, we employ a functional test. Specifically, we ask
 whether there is a reasonable likelihood that the jury
 understood the court's statements, in the context of the
 instructions as a whole and the trial record, to allow a
 conviction based on a standard lower than beyond a reasonable
 doubt. Id. at ¶¶ 2, 43, 59; accord
 Estelle v. McGuire, 502 U.S. 62, 72 (1991);
 Johnson, ¶ 14, 436 P.3d at 533. In this way,
 even statements made to the venire during voir dire can, in
 context, have the effect of instructing the jury on the law
 to be applied, and the reviewing court must determine whether
 such statements operated to reduce the prosecution's
 burden of proof. Tibbels, ¶¶ 2, 38-43;
 see also Johnson, ¶¶ 15-18, 436 P.3d at
 533-34 (considering whether a trial court's statement to
 a jury in voir dire regarding the meaning of reasonable doubt
 operated to lower the prosecution's burden of proof and
 concluding that it did not because the court gave a proper
 reasonable doubt
 
 
 20
 
 
 instruction both before and after the challenged statement
 and the court's statement was too "nonsensical"
 for the jury to understand).
 
 
 ¶37
 With these principles in mind, we turn to the statements at
 issue here.
 
 
 3.
 Application
 
 
 ¶38
 The first statement at issue involves the trial court's
 differentiation between a finding of a defendant's
 innocence and a finding that the defendant is not guilty.
 Although Pettigrew contends that the court's comments
 here lowered the prosecution's burden of proof by
 minimizing the presumption of innocence, we disagree. Indeed,
 in our view, the court's comments were helpful to
 Pettigrew because they made clear that to find Pettigrew not
 guilty, the jurors did not have to decide that he was
 actually innocent. Rather, the jurors only needed to find
 that the prosecution had not proved his guilt beyond a
 reasonable doubt. The court then concluded these comments
 with a correct statement of the reasonable doubt standard:
 "We say not guilty means the prosecution hasn't
 convinced you beyond a reasonable doubt, regardless of what
 evidence they introduce. If you have a reasonable doubt about
 the guilt of the defendant, then you find him not
 guilty." Based on the foregoing, we conclude that the
 court's statements regarding the differences between
 "innocent" and "not guilty" do not
 require reversal. ¶39 The second and third contested
 statements-in which the court criticized the pattern
 definition of reasonable doubt and then attempted to explain
 the
 
 
 21
 
 
 concept of reasonable doubt by using an example that involved
 a prospective juror's birthday-are intertwined, so we
 will address them together.
 
 
 ¶40
 As noted above, the trial court began its discussion by
 criticizing the pattern instruction on reasonable doubt,
 observing to a prospective juror that the instruction was
 "a little inadequate" because it attempts to
 "define a word using the word." The court
 nonetheless proceeded to read that pattern instruction, after
 which it purported to explain further the concept of
 "reasonable doubt" by using the birthday example.
 
 
 ¶41
 The court's comments in this regard raise several
 concerns.
 
 
 First,
 by stating that the established pattern instruction on
 reasonable doubt was "a little inadequate," the
 court undermined the very instruction that it later advised
 the jurors that they were to follow, making it far more
 likely that the jurors would rely instead on the court's
 birthday example as the standard for reasonable doubt Second,
 the birthday example was confusing at best and is arguably
 the type of commonplace example that Justices of the Supreme
 Court and courts in this jurisdiction have repeatedly warned
 are not proper substitutes for the legal definition of
 reasonable doubt See, eg, Victor, 511 U.S. at 24 (Ginsburg,
 J, concurring in part and concurring in the judgment)
 (agreeing that "decisions we make in the most important
 affairs of our lives-choosing a spouse, a job, a place to
 live, and the like-generally involve a very heavy element of
 uncertainty and
 
 
 22
 
 
 risk-taking," and such decisions "are wholly unlike
 the decisions jurors ought to make in criminal cases")
 (quoting Fed. Jud. Ctr., Pattern Crim. Jury Instr. 18-19
 (1987) (commentary on instruction 21)); People v.
 Knobee, 2020 COA 7, ¶¶ 39-40, 490 P.3d 543,
 550 (collecting cases). Third, in the course of providing its
 example, the court at one point referenced the fact that it
 had not "created a reasonable doubt," which at
 least raised the prospect of a juror's believing that
 Pettigrew had some obligation to create a reasonable doubt.
 
 
 ¶42
 Despite these concerns, when read in context, we cannot say
 that the court's comments lowered the prosecution's
 burden of proof. The court ended its discussion by correctly
 stating, "The burden is on the prosecution to remove all
 reasonable doubt." Indeed, the court said this
 immediately after its rhetorical question as to whether it
 had created a reasonable doubt. Accordingly, we perceive no
 risk that the prospective jurors would have interpreted the
 court's statement as placing any burden on Pettigrew.
 This is particularly true here, given that (1) in its
 comments regarding the distinction between
 "innocent" and "not guilty," the court
 had made clear that the prosecution had the burden of
 convincing the jurors beyond a reasonable doubt of
 Pettigrew's guilt; (2) after the jury was empaneled, the
 court thoroughly explained the reasonable doubt standard and
 the presumption of innocence in correct and clear terms; and
 (3) in its final instructions, the court correctly advised
 the jury on the concepts of the
 
 
 23
 
 
 prosecution's burden of proof, the presumption of
 innocence, and reasonable doubt. And given the clarity and
 succinctness of the court's repeated statements that the
 prosecution bore the burden of proving Pettigrew's guilt
 beyond a reasonable doubt, in contrast to its confusing
 birthday example, we cannot conclude that there is a
 reasonable likelihood that the jury understood the
 court's statements to have lowered the prosecution's
 burden of proof.
 
 
 ¶43
 Lastly, we turn to the court's reply to a prospective
 juror's expression of concern regarding the absence of
 child pornography charges in the case. As noted above, the
 court responded that the prosecution may not have brought
 such charges against Pettigrew because of a lack of
 supporting evidence, explaining that "we try people when
 there's evidence to support the charges."
 
 
 ¶44
 Of the statements at issue here, this one is perhaps the most
 troubling because a prospective juror could have interpreted
 it as the court's aligning itself with the prosecution,
 even if, in context, the court intended "we" to
 refer to society in general. Moreover, the statement arguably
 suggested that the prosecution had at least some evidence to
 support the charges against Pettigrew.
 
 
 ¶45
 Although this statement is concerning and the court should
 not have made it, we cannot conclude that, when read in
 context, it warrants reversal. The court mitigated the
 problematic implications of its statement because it
 immediately added, "[R]ight now [Pettigrew is] presumed
 innocent because there's no evidence
 
 
 24
 
 
 against him." Furthermore, the fact that the court's
 comment came in the course of a colloquy designed to tease
 out a particular prospective juror's possible bias-
 rather than as part of the court's general explanation of
 the law either during voir dire or after the jury was
 empaneled-reduces the statement's potential impact as an
 erroneous instruction of law.
 
 
 ¶46
 To be sure, some of the court's above-described comments
 were problematic and, perhaps, ill-advised, even though they
 were undoubtedly well-intentioned. Nevertheless, for the
 foregoing reasons, on the facts presented here, we conclude
 that there is no reasonable likelihood that the jury
 understood the trial court's contested statements, in the
 context of the instructions as a whole and the trial record,
 as lowering the prosecution's burden of proof below the
 reasonable doubt standard, in violation of Pettigrew's
 due process rights. Accordingly, we further conclude that
 none of the statements at issue constitutes structural error
 requiring reversal.
 
 
 ¶47
 We wish to emphasize that our disposition today should in no
 way be interpreted as condoning the trial court's
 statements. This case illustrates yet again why we and
 divisions of our court of appeals have repeatedly cautioned
 trial courts against attempting to define "reasonable
 doubt" by using examples and analogies. See,
 e.g., Johnson, ¶ 19, 436 P.3d at 534;
 People v. Vialpando, 2020 COA 42, ¶¶
 85-86, 490 P.3d 648, 661, cert. granted, No.
 20SC343, 2020 WL 6037070 (Colo.
 
 
 25
 
 
 Oct. 12, 2020). These efforts, at best, provide no additional
 clarity and, at worst, create needless litigation that
 jeopardizes otherwise valid convictions. See
 Johnson, ¶ 19, 436 P.3d at 534. Once again, we
 respectfully counsel trial courts to avoid attempting to
 define "reasonable doubt" in such ways.
 
 
 B.
 Cell Phone Search Warrant
 
 
 ¶48
 Turning next to Pettigrew's assertions regarding the
 constitutional validity of the search warrant for his cell
 phone, we start by addressing the appropriate standard of
 review. We then briefly discuss the applicable law, and we
 conclude that, in the circumstances presented here, any
 constitutional error in the admission of evidence derived
 from Pettigrew's cell phone was harmless beyond a
 reasonable doubt.
 
 
 1.
 Standard of Review
 
 
 ¶49
 A trial court's ruling on a motion to suppress presents a
 mixed question of fact and law. People v. Hyde, 2017
 CO 24, ¶ 9, 393 P.3d 962, 965. We therefore "defer
 to the trial court's findings of fact that are supported
 by the record, but we assess the legal effect of those facts
 de novo." Id. We likewise review de novo
 whether a redacted search warrant and supporting affidavit
 complied with the Fourth Amendment's particularity
 requirement. See People v. Hebert, 46 P.3d 473, 481
 (Colo. 2002) (observing that the supreme court reviews de
 novo whether a redacted affidavit is sufficient to establish
 probable cause).
 
 
 26
 
 
 ¶50
 We review preserved trial errors of constitutional dimension,
 including the admission of evidence obtained in violation of
 the Fourth Amendment, for constitutional harmless error.
 Hagos v. People, 2012 CO 63, ¶ 11, 288 P.3d
 116, 119 (noting the general rule); see also People v.
 Omwanda, 2014 COA 128, ¶ 31, 338 P.3d 1145, 1150
 (noting that the constitutional harmless error standard
 applies to the admission of evidence obtained through an
 unconstitutional search). Under this standard, reversal is
 required unless the reviewing court can conclude that the
 error was harmless beyond a reasonable doubt. Hagos,
 ¶ 11, 288 P.3d at 119. In other words, we will reverse
 if "there is a reasonable possibility that the
 [error] might have contributed to the conviction."
 Id. (alteration in original) (quoting Chapman v.
 California, 386 U.S. 18, 24 (1967)).
 
 
 2.
 Applicable Law
 
 
 ¶51
 The Fourth Amendment to the United States Constitution
 protects citizens against unreasonable searches and seizures.
 U.S. Const. amend. IV. To effectuate this protection, the
 Supreme Court has adopted an exclusionary rule under which
 evidence obtained as a result of an illegal search or seizure
 is inadmissible against a criminal defendant. Wong Sun v.
 United States, 371 U.S. 471, 484 (1963). Even so, the
 government may introduce such evidence if an exception to the
 exclusionary rule applies. People v. Schoondermark,
 759 P.2d 715, 718 (Colo. 1988).
 
 
 27
 
 
 ¶52
 One such exception is the so-called "independent source
 doctrine," which permits the admission of
 unconstitutionally obtained evidence "if the prosecution
 can establish that it was also discovered by means
 independent of the illegality." Id. For
 example, a subsequent search pursuant to a warrant can
 constitute an independent source if the police
 department's decision to seek the warrant was not
 prompted by what the police officers saw during an illegal
 entry and if the information obtained as a result of the
 prior illegality did not affect the magistrate's decision
 to issue the warrant. Murray v. United States, 487
 U.S. 533, 542 (1988). To determine whether the independent
 source exception applies in circumstances such as these, we
 must decide whether, after redacting the illegally obtained
 information from the warrant and its supporting affidavit,
 the warrant satisfied the Fourth Amendment's requirements
 that search warrants be supported by probable cause and
 describe with particularity "the place to be searched,
 and the persons or things to be seized." U.S. Const.
 amend. IV.; People v. Arapu, 2012 CO 42, ¶ 26,
 283 P.3d 680, 685-86.
 
 
 3.
 Constitutional Harmless Error
 
 
 ¶53
 Here, Pettigrew argues that the division below erred in
 concluding that the independent source exception justified
 the admission at trial of the evidence obtained from his cell
 phone. According to Pettigrew, a properly redacted version of
 the search warrant and its supporting affidavit would have
 included only
 
 
 28
 
 
 Pettigrew's cell phone number because all other
 descriptive information about the cell phone, such as the
 phone's make, model, and color, was illegally obtained
 during the initial warrantless arrest and seizure of the
 phone. Pettigrew thus asserts that a properly redacted search
 warrant could not have satisfied the Fourth Amendment's
 particularity requirement and, therefore, the illegally
 obtained information must have affected the magistrate's
 decision to issue the warrant, making the independent source
 exception inapplicable here.
 
 
 ¶54
 On the record before us, we need not decide this issue
 because, assuming without deciding that the warrant did not
 satisfy the Fourth Amendment's particularity requirement
 and that the People therefore could not establish the
 applicability of the independent source exception, the
 admission of the evidence obtained from Pettigrew's cell
 phone was harmless beyond a reasonable doubt.
 
 
 ¶55
 The evidence obtained from Pettigrew's cell phone related
 only to his conviction for pandering of a child, which
 required the prosecution to prove that Pettigrew, for money
 or other thing of value, knowingly arranged or offered to
 arrange a situation in which a child may practice
 prostitution. § 18-7-403(1)(b), C.R.S. (2021).
 
 
 ¶56
 As to the charge of pandering, the constitutionally
 admissible evidence establishing Pettigrew's guilt was
 overwhelming. K.T. testified that she and Pettigrew had
 discussed on numerous occasions, by text message, by
 telephone,
 
 
 29
 
 
 and in person, a plan that would enable K.T. to engage in
 prostitution. K.T. explained that, as part of this
 arrangement, Pettigrew would act as her pimp by connecting
 her with his coworkers from the North Dakota oil fields, who
 would pay K.T. for sex at a rate of $300 per hour. In
 addition, a forensic report compiled from K.T.'s cell
 phone detailing text messages and photographs exchanged
 between K.T. and Pettigrew corroborated K.T.'s testimony.
 This report included multiple conversations between Pettigrew
 and K.T. in which the two discussed prostitution and
 Pettigrew encouraged K.T. to get involved in the prostitution
 business. In the context of one such conversation included in
 the report, K.T. sent Pettigrew sexually explicit photographs
 of herself after he requested them. Further corroborating
 K.T.'s story, K.T.'s best friend, C.E., testified
 that K.T. and Pettigrew had developed a plan whereby
 Pettigrew would identify coworkers from the oil fields who
 would pay to have sex with K.T.
 
 
 ¶57
 Although the forensic reports produced from Pettigrew's
 cell phone also supported his involvement in the prostitution
 arrangement by demonstrating that he had received the text
 messages discussing prostitution and some of the sexually
 explicit photographs that K.T. had sent him, the evidence
 contained in those reports was cumulative of K.T.'s
 detailed testimony explaining the prostitution arrangement
 and the report produced from her cell phone.
 
 
 30
 
 
 ¶58
 We are not persuaded otherwise by the fact that the
 prosecution briefly referenced evidence obtained from
 Pettigrew's cell phone during its opening statement and
 closing argument. Even without the evidence from
 Pettigrew's phone, the prosecution still could have told
 the jury during its opening that the jurors would have the
 opportunity to evaluate text messages exchanged between K.T.
 and Pettigrew, as well as the photographs that K.T. had sent
 to Pettigrew, because the evidence relating to K.T.'s
 cell phone supported such a statement. Likewise, the evidence
 from K.T.'s cell phone and the reasonable inferences that
 the jurors could have drawn therefrom would have entitled the
 prosecution to argue in closing that Pettigrew's having
 the photographs on his cell phone (which the evidence showed
 K.T. sent to Pettigrew) would have allowed him to advertise
 K.T. to his coworkers.
 
 
 ¶59
 Accordingly, we conclude that the admission of any evidence
 derived from Pettigrew's cell phone was harmless beyond a
 reasonable doubt.
 
 
 III.
 Conclusion
 
 
 ¶60
 For the foregoing reasons, we conclude that the trial
 court's statements to the jury venire during voir dire
 did not, in light of the instructions as a whole and the
 trial record, lower the prosecution's burden of proof in
 violation of due process. We further conclude that the
 admission at trial of evidence obtained from Pettigrew's
 cell phone was harmless beyond a reasonable doubt.
 
 
 31
 
 
 ¶61
 Accordingly, we affirm the judgment of the division below.
 
 
 32
 
 
 ---------
 
 
 Notes:
 
 
 [1] Specifically, we granted certiorari to
 review the following issues:
 
 
 1. Whether the trial court lowered the burden of proof
 and undermined the presumption of innocence in violation of
 due process by calling the legal definition of reasonable
 doubt "inadequate;" analogizing the beyond a
 reasonable doubt standard to potential doubts about a
 juror's birthday; stating that "we try people when
 there's evidence to support the charges;" and
 distinguishing "actual innocence" from a finding of
 not guilty.
 
 
 2. Whether the court of appeals erred in determining
 that the warrant to search Petitioner's cell phone and
 supporting affidavit satisfied the Fourth Amendment's
 particularity requirement, where all descriptive information
 about the phone except the telephone number was obtained as a
 result of Petitioner's unlawful arrest.
 
 
 ---------