2022 CO 1 Ernest Joseph Tibbels, Petitioner/Cross-Respondent v. The People of the State of Colorado, Respondent/Cross-Petitioner No. 20SC22
Supreme Court of Colorado, En banc
January 10, 2022
 
 1
 
 
 
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 17CA620
 
 
 2
 
 
 
 Attorneys for Petitioner/Cross-Respondent: Megan A. Ring,
 Public Defender Meredith K. Rose, Deputy Public Defender
 Denver, Colorado
 
 
 
 Attorneys for Respondent/Cross-Petitioner: Philip J. Weiser,
 Attorney General Jacob R. Lofgren, Assistant Attorney General
 Denver, Colorado
 
 
 
 JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 
 3
 
 
 
 OPINION
 
 
 
 GABRIEL, JUSTICE
 
 
 ¶1
 This case, a companion case to Pettigrew v. People,
 2022 CO 2, __P.3d__, which we also decide today, requires us
 to consider again whether a trial court's comments to a
 jury venire attempting to explain the concept of reasonable
 doubt effectively lowered the prosecution's burden of
 proof. Although we granted certiorari to consider three
 questions, [1] these questions really present two issues
 for our determination. First, we must decide the proper test
 for determining whether a trial court's comments to
 prospective jurors lowered the prosecution's burden of
 proof. Second, we must consider whether the example that the
 trial court used here to explain the concept of reasonable
 doubt lowered the prosecution's burden of proof.
 
 
 4
 
 
 ¶2
 We now conclude that the proper test for determining whether
 a trial court's statements to the jury lowered the
 prosecution's burden of proof is a functional one.
 Specifically, an appellate court must ask whether there is a
 reasonable likelihood that the jury understood the
 court's statements, in the context of the instructions as
 a whole and the trial record, to allow a conviction based on
 a standard lower than beyond a reasonable doubt. In this way,
 statements made to the venire during voir dire can, in
 context, have the effect of instructing the jury on the law
 to be applied, whether or not such statements can be
 characterized as formal "instructions," and other
 facts and circumstances of the trial may well inform the
 question of how the jury would reasonably have understood
 such statements.
 
 
 ¶3
 Applying the foregoing standard to the specific facts
 presented here, in which the court equated the concept of
 reasonable doubt to the doubt that a prospective homebuyer
 would have upon observing a structurally significant,
 floor-to-ceiling crack in the home's foundation, we
 further conclude that it is reasonably likely that the jury
 understood the court's statements to allow a conviction
 on a standard lower than beyond a reasonable doubt, which
 constitutes structural error.
 
 
 ¶4
 Accordingly, we reverse the judgment of the division below.
 
 
 5
 
 
 I.
 Facts and Procedural History
 
 
 ¶5
 On March 4, 2016, Ernest Tibbels called 911 while
 experiencing a mental health crisis. Commerce City police
 officers responded to the call and, rather than taking
 Tibbels to a hospital as he had requested, arrested him under
 the mistaken belief that he was violating the terms of a
 protection order.
 
 
 ¶6
 The officers transported Tibbels to the Adams County
 Detention Facility, where he resisted the officers'
 attempts to complete the booking process. Because he was
 agitated and combative, the officers did not remove his
 handcuffs or take him through the body scanner, which would
 have required removing the handcuffs. Instead, they took him
 to the so-called "booking quiet room," where they
 could pat him down, remove his handcuffs, and let him sit and
 cool down.
 
 
 ¶7
 Approximately one hour later, an officer walked by the quiet
 room and noticed that Tibbels had torn pieces from his shirt
 and placed the pieces around his neck. Tibbels threatened to
 kill himself and anyone else who entered the quiet room and
 then hit the window of that room with a sharpened metal
 spike. Officers called for lethal cover, locked down the
 jail, and repeatedly ordered Tibbels to set the spike down.
 Although Tibbels did not initially comply, he eventually
 dropped the spike and complied with requests to lie down with
 his hands behind his back, at which point officers entered
 the room, re-handcuffed him, placed him in a restraint chair,
 and confiscated the three-inch long spike.
 
 
 6
 
 
 ¶8
 The prosecution subsequently charged Tibbels with first
 degree introduction of contraband, felony menacing, and first
 degree possession of contraband, and the case proceeded to
 trial.
 
 
 ¶9
 During voir dire of the prospective jurors, the trial court
 read a portion of the pattern instruction defining
 "reasonable doubt." The court, however, then
 immediately undermined that definition, stating, "Now,
 you're all sitting there saying what the hell does that
 mean. It's a lengthy definition, okay. And don't lose
 heart. I'll give you an example and see if we can put
 some teeth and make this concrete."
 
 
 ¶10
 The trial court then offered the following as an illustration
 of reasonable doubt:
 
 
 All right. So you and your spouse and your children are in a
 market to by [sic] a house, okay. And you're looking for
 a ranch, 2, 000 square foot, full basement, and you want to
 be on an acre of land. You know, the school-you want to be in
 the 27-J School District.
 
 
 You-so you get yourself a realtor, you and your husband and
 your kids, you start go looking for a house [sic]. Let's
 just say in the Brighton area, for example. And you're
 looking for that ranch and that size property. And you come
 upon that ranch and it's just like the dream come true,
 okay. The price is right. Interest rates are still good.
 It's in the location that you want. The schools are good.
 The neighborhood is wonderful, it's perfect.
 
 
 So one Saturday morning you go out to the property with the
 realtor and your family and you fall in love with it,
 it's just wonderful. So you're walking around the
 exterior. You're walking inside, it looks great. And you
 descend the flight of stairs down to the basement and as you
 get to the bottom of the basement steps you look around and
 
 
 7
 
 
 to the far concrete wall you look and you see a crack in the
 foundation from the floor to the ceiling. And it's not
 that superficial cracking that concrete will do. And
 structurally it's significant. Are you going to buy that
 house?
 
 
 ¶11
 A prospective juror answered that she would not buy the house
 because she would not want a house with a bad foundation.
 
 
 ¶12
 The trial court continued:
 
 
 Okay. You've got a reason. And it's this crack that
 is structurally significant. And that's causing you to
 hesitate, causing you to pause with going forward with a home
 purchase. This is my example of reasonable doubt.
 
 
 Now the lawyers usually do a better job, all right. But does
 that kind of put some-you can kind of touch and feel what
 reasonable doubt is. It's not-it's not aliens coming
 down and telling you don't buy the house, okay. It's
 something that you can kind of touch or feel or an inference
 that you may be able to draw.
 
 
 ¶13
 The trial court returned to this example later during voir
 dire, telling the prospective jurors that the
 prosecution's burden is "proof beyond a reasonable
 doubt. And it's that example that I gave you, what a
 reasonable doubt is. So that's the burden that the
 government has to surmount to prove this case beyond a
 reasonable doubt."
 
 
 ¶14
 Defense counsel did not object to the court's example.
 Nor did the trial court ever withdraw its example or instruct
 the jury to disregard it.
 
 
 ¶15
 At the conclusion of the evidence the court instructed the
 jury on the applicable law and gave the pattern jury
 instruction on reasonable doubt. The jury
 
 
 8
 
 
 ultimately found Tibbels guilty of possession of contraband
 but acquitted him of the other two charges.
 
 
 ¶16
 Tibbels appealed, arguing that the trial court's example
 lowered the prosecution's burden of proof by setting too
 high a standard for what qualifies as reasonable doubt and
 that this was structural error requiring reversal. In a
 split, published opinion, a division of the court of appeals
 affirmed Tibbels's conviction. People v.
 Tibbels, 2019 COA 175, 490 P.3d 517.
 
 
 ¶17
 As pertinent here, the majority concluded that the trial
 court's reasonable doubt illustration did not
 unconstitutionally lower the prosecution's burden of
 proof. Id. at ¶ 35, 490 P.3d at 525. The
 majority reached this conclusion for five reasons: (1) the
 trial court had characterized its illustration as an
 "example" and said that the attorneys would do a
 better job of explaining reasonable doubt; (2) the
 illustration was given only during the jury selection portion
 of the trial; (3) the court told the prospective jurors that,
 at the conclusion of the evidence, it would tell the jurors
 the rules of law that they were to use in reaching their
 verdict and would provide copies of those rules to the jury,
 and the court never provided its illustration in writing; (4)
 before giving its illustration and again at the close of the
 evidence, the court properly instructed the jury on the
 meaning of reasonable doubt; and (5) the jury never indicated
 any confusion about reasonable doubt, and
 
 
 9
 
 
 the majority therefore presumed that the jury understood and
 followed the trial court's instructions. Id. at
 ¶¶ 35-39, 490 P.3d at 525.
 
 
 ¶18
 The majority nonetheless "strongly discourage[d]"
 trial courts from using "everyday illustrations" to
 explain the concept of reasonable doubt, id. at
 ¶ 40, 490 P.3d at 525, because such illustrations
 "run the risk of confusing jurors, lowering the
 prosecution's burden of proof, and diminishing the
 presumption of innocence," id. at ¶ 23,
 490 P.3d at 523. Indeed, the majority noted that divisions of
 the court of appeals had repeatedly discouraged trial courts
 from using such illustrations to explain reasonable doubt,
 the presumption of innocence, and other legal concepts.
 Id. at ¶ 33, 490 P.3d at 525.
 
 
 ¶19
 Judge Pawar dissented. In her view, it was reasonably likely
 that the trial court's illustration had set too high a
 bar for what constitutes reasonable doubt and suffices for an
 acquittal, thereby lowering the prosecution's burden of
 proof and constituting structural error. Id. at
 ¶¶ 56, 58, 490 P.3d at 527-28 (Pawar, J.,
 dissenting). Judge Pawar reached this conclusion for several
 reasons: (1) the trial court never told the jury to
 disregard, ignore, or otherwise not apply its example; (2)
 the court's illustration did not contradict the abstract
 explanations of reasonable doubt contained in the court's
 final instructions but rather more specifically and precisely
 defined those explanations, informing the jury how to apply
 the abstract concepts in a real-life situation; and (3) the
 fact that the court's
 
 
 10
 
 
 example "was not technically a formal instruction"
 was unimportant because "it was an uncontradicted
 explanation of reasonable doubt from the judge, the one
 person in the courtroom whose words everyone, including the
 jury, must heed." Id. at ¶¶ 60-64,
 490 P.3d at 528-29.
 
 
 ¶20
 Tibbels then petitioned for certiorari, and the People filed
 a cross-petition. We granted both petitions.
 
 
 II.
 Analysis
 
 
 ¶21
 We begin by addressing the applicable standard of review.
 After next reviewing the legal principles governing the
 necessity of instructing the jury on the concept of
 reasonable doubt, we articulate the test to be applied to
 determine whether a trial court's statements to the jury
 regarding the applicable law lowered the prosecution's
 burden of proof. We then proceed to apply this standard to
 the facts now before us.
 
 
 A.
 Standard of Review
 
 
 ¶22
 We review de novo the question of whether a trial court
 accurately instructed the jury on the law. Johnson v.
 People, 2019 CO 17, ¶ 8, 436 P.3d 529, 531.
 Instructions that lower the prosecution's burden of proof
 below the reasonable doubt standard constitute structural
 error and require automatic reversal. Id.;
 accord Sullivan v. Louisiana, 508 U.S. 275, 281-82
 (1993).
 
 
 11
 
 
 B.
 Applicable Law
 
 
 ¶23
 The Due Process Clause of the United States Constitution
 "protects the accused against conviction except upon
 proof beyond a reasonable doubt of every fact necessary to
 constitute the crime with which he is charged." In
 re Winship, 397 U.S. 358, 364 (1970); accord Vega v.
 People, 893 P.2d 107, 111 (Colo. 1995). The Supreme
 Court has thus made clear that the reasonable doubt standard
 is "indispensable" in criminal prosecutions.
 See Winship, 397 U.S. at 364.
 
 
 ¶24
 Intrinsically related to this standard is the presumption of
 innocence afforded criminal defendants. See Delo v.
 Lashley, 507 U.S. 272, 278 (1993) (per curiam)
 (observing that the presumption of innocence "operates
 at the guilt phase of a trial to remind the jury that the
 State has the burden of establishing every element of the
 offense beyond a reasonable doubt"). As the Supreme
 Court has stated, "The [reasonable doubt] standard
 provides concrete substance for the presumption of
 innocence-that bedrock 'axiomatic and elementary'
 principle whose 'enforcement lies at the foundation of
 the administration of our criminal law.'"
 Winship, 397 U.S. at 363 (quoting Coffin v.
 United States, 156 U.S. 432, 453 (1895)).
 
 
 ¶25
 In light of the foregoing, the court must properly instruct
 the jury on-and, as the fact finder, the jury must apply-the
 reasonable doubt standard. Johnson, ¶ 13, 436
 P.3d at 533. In this regard, trial courts retain some
 flexibility in defining
 
 
 12
 
 
 for the jury what constitutes a reasonable doubt.
 Id. at ¶ 10, 436 P.3d at 532; see also
 Victor v. Nebraska, 511 U.S. 1, 5 (1994) ("[S]o
 long as the court instructs the jury on the necessity that
 the defendant's guilt be proved beyond a reasonable
 doubt, the Constitution does not require that any particular
 form of words be used in advising the jury of the
 government's burden of proof.") (citation omitted).
 Nonetheless, both this court and the Supreme Court have
 repeatedly cautioned that attempts by trial courts to define
 "reasonable doubt" in ways beyond the
 long-established pattern instructions do not often clarify
 the term, see, e.g., Holland v. United
 States, 348 U.S. 121, 140 (1954); Johnson,
 ¶¶ 13, 19, 436 P.3d at 532, 534, and that trial
 courts must guard against defining "reasonable
 doubt" in a way that allows the jury to convict on a
 lesser showing than due process requires, see
 Victor, 511 U.S. at 22; Johnson, ¶ 13, 436
 P.3d at 532. The trial courts' decisions not to heed this
 admonition in both this case and in Pettigrew,
 ¶¶ 15-16, which we also decide today, have again
 placed before us the question of whether a trial court's
 efforts to define "reasonable doubt" violated a
 defendant's due process rights.
 
 
 C.
 Test for Instructional Error on Reasonable Doubt
 
 
 ¶26
 To decide the test that we should apply to determine whether
 a trial court's instructions to the jury lowered the
 prosecution's burden of proof, we are guided by Supreme
 Court case law regarding the standard for assessing allegedly
 defective jury instructions.
 
 
 13
 
 
 ¶27
 In Boyde v. California, 494 U.S. 370, 372 (1990),
 the Court considered whether two jury instructions used in
 the penalty phase of a capital murder trial were consistent
 with the Eighth Amendment. The defendant claimed that the
 instructions did not allow the jury to consider mitigating
 evidence of his background and character and therefore
 prevented the jury from making the requisite individualized
 assessment as to whether the imposition of the death penalty
 was appropriate. Id. at 375-76.
 
 
 ¶28
 The Court began its analysis by recognizing the
 "well-established proposition that a single instruction
 to a jury may not be judged in artificial isolation, but must
 be viewed in the context of the overall charge."
 Id. at 378 (quoting Cupp v. Naughten, 414
 U.S. 141, 146-47 (1973)). Noting that the legal standard for
 reviewing allegedly defective jury instructions had been
 "less than clear," id., the Court
 determined that the proper inquiry in such a case is
 "whether there is a reasonable likelihood that the jury
 has applied the challenged instruction in a way that prevents
 the consideration of constitutionally relevant
 evidence," id. at 380. The Court opined that
 such a standard "better accommodates the concerns of
 finality and accuracy than does a standard which makes the
 inquiry dependent on how a single hypothetical
 'reasonable' juror could or might have interpreted
 the instruction." Id. The Court further
 explained:
 
 
 Jurors do not sit in solitary isolation booths parsing
 instructions for subtle shades of meaning in the same way
 that lawyers might.
 
 
 14
 
 
 Differences among them in interpretation of instructions may
 be thrashed out in the deliberative process, with commonsense
 understanding of the instructions in the light of all that
 has taken place at the trial likely to prevail over technical
 hairsplitting.
 
 
 Id. at 380-81.
 
 
 ¶29
 Applying the foregoing standard to the case before it, the
 Court concluded that there was no reasonable likelihood that
 the jurors had interpreted the instructions at issue to
 prevent consideration of mitigating evidence. Id. at
 381.
 
 
 ¶30
 The Supreme Court returned to the question of the proper
 standard for interpreting allegedly faulty jury instructions
 in Estelle v. McGuire, 502 U.S. 62 (1991), a case in
 which the defendant had been convicted of murdering his
 infant daughter. Specifically, in examining the propriety of
 a prior bad acts instruction, which the defendant claimed
 amounted to a propensity instruction that violated his right
 to due process, the Court reiterated that a challenged
 instruction may not be assessed in isolation "but must
 be considered in the context of the instructions as a whole
 and the trial record." Id. at 71-72. The Court
 thus again applied the "reasonable likelihood"
 standard, stating, "[I]n reviewing an ambiguous
 instruction such as the one at issue here, we inquire
 'whether there is a reasonable likelihood that the jury
 has applied the challenged instruction in a way' that
 violates the Constitution." Id. at 72 (quoting
 Boyde, 494 U.S. at 380).
 
 
 ¶31
 In accordance with that standard, the Court perceived no
 reasonable likelihood that the jury would have concluded that
 the instruction, read in the
 
 
 15
 
 
 context of the other instructions, authorized the use of
 propensity evidence to establish the defendant's guilt.
 Id. at 74-75.
 
 
 ¶32
 Lastly, in Victor, 511 U.S. at 5-10, 14-19, the
 Court applied the foregoing line of reasoning in the context
 of trial courts' attempts to define "reasonable
 doubt." Victor involved two separate murder
 convictions in which the defendants challenged the trial
 courts' instructions on reasonable doubt. Id. at
 7-10, 18-19.
 
 
 ¶33
 In the first case, the trial court defined "reasonable
 doubt" as "not a mere possible doubt; because
 everything relating to human affairs, and depending on moral
 evidence, is open to some possible or imaginary doubt."
 Id. at 7. The court continued, "It is that
 state of the case which, after the entire comparison and
 consideration of all the evidence, leaves the minds of the
 jurors in that condition that they cannot say they feel an
 abiding conviction, to a moral certainty, of the truth of the
 charge." Id. The defendant objected to the
 phrases "moral evidence" and "moral
 certainty," arguing that modern jurors would have
 understood those phrases to mean a standard of proof lower
 than beyond a reasonable doubt. Id. at 10, 14.
 
 
 ¶34
 In the second case, the court instructed the jury on
 reasonable doubt using the same concept of "moral
 certainty" and further advised the jury, among other
 things, that "[a] reasonable doubt is an actual and
 substantial doubt" arising from the evidence or lack
 thereof. Id. at 18. The defendant challenged this
 instruction
 
 
 16
 
 
 on the ground that equating a reasonable doubt with a
 substantial doubt overstated the degree of doubt required for
 a conviction. Id. at 19.
 
 
 ¶35
 The Court began its analysis by noting that as long as a
 trial court instructs the jury that the defendant's guilt
 must be proved beyond a reasonable doubt, the Constitution
 does not require that any particular words be used in
 advising the jury of the prosecution's burden of proof.
 Id. at 5. Instead, the instructions, taken as a
 whole, must correctly convey the concept of reasonable doubt
 to the jury. Id. Thus, the question in the cases
 before the Court was "whether there is a reasonable
 likelihood that the jury understood the instructions to allow
 conviction based on proof insufficient to meet the
 Winship [i.e., reasonable doubt] standard."
 Id. at 6. Applying that standard, the Court
 determined that, although the instructions in the two cases
 were concerning and "somewhat problematic," when
 considered in the context of the instructions as a whole and
 the trial record, there was no reasonable likelihood that the
 jurors would have understood the challenged instructions to
 allow conviction on a standard of proof lower than the
 reasonable doubt standard. Id. at 13, 16-17, 19,
 21-23.
 
 
 ¶36
 As the foregoing makes clear, in a wide array of
 settings-including in the context of deciding whether
 instructions on the meaning of reasonable doubt
 unconstitutionally lowered the prosecution's burden of
 proof-the Supreme Court has employed a functional test,
 asking whether there is a reasonable
 
 
 17
 
 
 likelihood that the jury understood a contested instruction,
 in the context of the instructions as a whole and the trial
 record, to allow a conviction based on a standard lower than
 beyond a reasonable doubt. And we have applied this standard
 as well. Thus, in Johnson, ¶ 14, 436 P.3d at
 533, we stated, "When reviewing an ambiguous jury
 instruction . . ., we ask whether there is a reasonable
 likelihood that the jury applied the contested instruction in
 an unconstitutional manner," noting further that we do
 not consider instructions in isolation, but rather in the
 context of the instructions as a whole.
 
 
 ¶37
 The question thus becomes whether the same standard should
 apply to statements regarding the law that a trial court
 makes either during the jury selection process or otherwise
 outside the context of the court's formal instructions to
 the jury. Although we did not need to address this issue in
 Johnson, in which the trial court also made the
 challenged statements during voir dire, the issue is squarely
 presented here because the People contend that the
 court's illustration was neither a definition of
 "reasonable doubt" nor an instruction of law and
 therefore did not implicate the above-described principles
 and structural error analysis.
 
 
 ¶38
 For several reasons, we reject the People's apparent
 premise that only formal instructions of law implicate the
 above-described principles.
 
 
 18
 
 
 ¶39
 First, such a view ignores the facts that the court advises
 the jury of applicable principles of law throughout a trial
 (including during the jury selection process) and jurors
 listen carefully to the court's explanation of the law
 that they must apply in deciding the case. Accordingly,
 although it is certainly true that not every statement that a
 trial judge makes in the course of a trial amounts to a
 statement of the law that the jury must apply, we cannot
 exclude the possibility that, when considered in context,
 certain statements by the court, whether made in the context
 of formal jury instructions or not, may well rise to such a
 level-or at least impact the formal instructions that the
 court provides.
 
 
 ¶40
 Second, we do not expect jurors to make fine distinctions
 between statements of applicable law that the court makes in
 one context as opposed to another. Rather, as the Supreme
 Court said in Boyde, 494 U.S. at 381, we anticipate
 that jurors will rely on their "commonsense
 understanding of the instructions in the light of all that
 has taken place at the trial" and that this
 understanding will "prevail over technical
 hairsplitting." See also United States v.
 Hernandez, 176 F.3d 719, 733-34 (3d Cir. 1999)
 (rejecting arguments that a trial court's comments during
 voir dire regarding the meaning of "reasonable
 doubt" would not likely have influenced the jury's
 decision because such comments came early in the trial and
 were merely comments and not formal instructions, reasoning,
 (1) "We will not assume that jurors, contrary to their
 oath, ignored part of the judge's initial
 
 
 19
 
 
 instruction simply because it came early in the trial";
 and (2) the record did not show that the jurors would have
 drawn the "fine distinction" between a judge's
 comments on the law and more formal instructions, and the
 jury was never instructed to ignore the substantive portion
 of the court's initial instructions in determining the
 meaning of reasonable doubt).
 
 
 ¶41
 Thus, whether it is reasonably likely that a jury would have
 understood a trial court's statements regarding the
 applicable law so as to lower the prosecution's burden of
 proof depends on the nature of the statements, the context in
 which they were made, any other explanations or instructions
 that the court may have provided, and, of course, the
 court's final jury charge.
 
 
 ¶42
 Third, we believe that a functional test, rather than one
 that, as a matter of law, excludes from consideration all
 statements by a trial judge other than those contained in
 formal jury instructions, will allow reviewing courts to
 consider the trial judge's statements in context, with a
 realistic eye as to how jurors would likely have understood
 those statements.
 
 
 ¶43
 Accordingly, we now conclude that in considering whether a
 court's statements to a jury regarding the meaning of
 "reasonable doubt" (whether in formal instructions
 or not) unconstitutionally lowered the prosecution's
 burden of proof, an appellate court must ask whether there is
 a reasonable likelihood that the jury understood the
 court's statements, in the context of the instructions as
 a
 
 
 20
 
 
 whole and the trial record, to allow a conviction based on a
 standard lower than beyond a reasonable doubt.
 
 
 ¶44
 Having thus articulated the governing standard, we proceed to
 apply that standard in the case now before us.
 
 
 D.
 Application
 
 
 ¶45
 Although we have found no case directly on point, a number of
 cases decided by sister courts are instructive.
 
 
 ¶46
 Stoltie v. California, 501 F.Supp.2d 1252 (C.D. Cal.
 2007), aff'd sub nom. Stoltie v.
 Tilton, 538 F.3d 1296 (9th Cir. 2008) (per curiam), was
 a federal habeas corpus proceeding following a
 defendant's conviction in state court. In that case, the
 jury had repeatedly expressed confusion during its
 deliberations regarding the meaning of "reasonable
 doubt." Id. at 1253-55. In response, the court
 gave the following example regarding Blythe, a town on the
 Colorado River in the California Sonoran Desert, to
 illustrate reasonable doubt:
 
 
 If I were to tell you that I am going to Blythe . . . I'm
 gonna go there in the middle of July and I am taking my skis
 with me because it snows every July, you might say, I doubt
 it. And that would be a reasonable doubt, wouldn't it?
 
 
 But if I told you I am going to Blythe and I am taking my
 swimming suit and water skiis [sic] to go skiing in the
 Colorado River in the middle of July, but I am afraid it
 might be too cold, you'd think, I doubt it, but maybe
 that's not so unreasonable. Reason and logic apply.
 
 
 Id. at 1255 (footnotes omitted).
 
 
 21
 
 
 ¶47
 A federal habeas court ultimately concluded that this
 illustration, when considered in the context of the overall
 jury charge, "raised the degree of doubt required for
 acquittal from a reasonable doubt to an extreme doubt."
 Id. at 1264. Specifically, the court observed that
 this analogy improperly "suggested that the jury should
 acquit only if the prosecution's theory was as utterly
 improbable as a person going skiing in the desert in
 July." Id. Accordingly, the court concluded,
 "Because this instruction equated an extreme doubt with
 a reasonable doubt, it created a reasonable likelihood that
 the jury would apply an unconstitutional standard of proof,
 believing [the defendant] could only be acquitted if the
 prosecution's theory was essentially impossible."
 Id.
 
 
 ¶48
 Similarly, in Wansing v. Hargett, 341 F.3d 1207,
 1209 (10th Cir. 2003), during voir dire, a prospective juror
 asked the court for more guidance regarding the meaning of
 "reasonable doubt." The trial judge then recalled a
 trial in which he had been involved as a lawyer and in which
 the prosecutor had told the jury that reasonable doubt was
 the kind of serious doubt that causes one to act or not act
 in serious matters like calling off a wedding at the last
 minute after walking down the aisle. Id. The
 defendant was convicted and appealed, and the appellate court
 reversed, concluding that the trial court's remarks had
 "made it reasonably likely that the jury would
 overestimate the amount of latitude it had in defining the
 reasonable doubt standard." Id. at 1215.
 Specifically, the court determined that
 
 
 22
 
 
 the trial court's instruction had improperly suggested
 that the reasonable doubt standard "comprises as broad a
 range of burdens of proof as that suggested by the wedding
 analogy." Id.
 
 
 ¶49
 Applying similar reasoning here, we believe that it is
 reasonably likely that the jury applied the trial court's
 crack-in-the-foundation illustration in a manner that allowed
 for conviction based on a standard lower than proof beyond a
 reasonable doubt. We reach this conclusion for several
 reasons.
 
 
 ¶50
 First, the trial court began its discussion of reasonable
 doubt by undermining the pattern instruction on that concept
 and giving its own example to explain the principle.
 Specifically, as noted above, after reading the pattern
 reasonable doubt instruction to the prospective jurors, the
 court immediately said that they must be "sitting there
 saying what the hell does that mean." The court then
 advised the prospective jurors not to "lose heart"
 because the court would provide an example to make the
 definition "concrete," and the court proceeded to
 provide its nonlegal, crack-in-the-foundation illustration.
 In our view, the trial court's focus on this nonlegal,
 real-world example made the illustration highly significant
 and ensured that the jury would give it undue weight. This is
 particularly true given that (1) the court gave the example
 immediately after undermining the pattern instruction on
 reasonable doubt; (2) the court came back to its illustration
 later in voir dire, expressly equating reasonable doubt with
 "that
 
 
 23
 
 
 example that I gave you"; and (3) as in
 Hernandez, 176 F.3d at 733, the court never
 instructed the jury to disregard its example.
 
 
 ¶51
 Second, the crack-in-the-foundation illustration established
 a higher degree of doubt than is required for an acquittal.
 Specifically, as noted above, the court equated the concept
 of reasonable doubt with this scenario, but we would expect
 that everyone would likely hesitate to buy a house with a
 structurally significant, floor-to-ceiling crack in the
 foundation. Accordingly, the court's example suggested
 that a reasonable doubt was one that was so obvious that it
 would give every reasonable person pause and cause them to
 hesitate to act. As was the case with the wedding analogy in
 Wansing, 341 F.3d at 1215, such an example
 overstated the degree of doubt and uncertainty required for
 an acquittal. Indeed, in our view, like the skiing example in
 Stoltie, 501 F.Supp.2d at 1264, the court's
 instruction here suggested to the jurors that they could
 acquit Tibbels only if the evidence established an extreme
 doubt-i.e., one akin to going forward with a home purchase
 notwithstanding a floor-to-ceiling crack in the home's
 foundation. This, in turn, unconstitutionally lowered the
 prosecution's burden of proof. ¶52 Third, the trial
 court's illustration arguably suggested to the jurors
 that
 
 
 Tibbels
 had some obligation to present evidence to create a
 reasonable doubt in the jurors' minds. Specifically,
 after providing the crack-in-the-foundation example, the
 court commented, "You've got a reason. And it's
 this crack that is
 
 
 24
 
 
 structurally significant. . . . This is my example of
 reasonable doubt." This example, however, appears to
 have turned the presumption of innocence on its head,
 improperly suggesting to the prospective jurors that they
 were to start with a presumption of guilt and then look for
 evidence to create in their minds a reasonable doubt, i.e.,
 "a reason" to acquit. For this reason as well, the
 example that the court gave violated Tibbels's
 constitutional rights.
 
 
 ¶53
 For all of these reasons, we conclude that, considering the
 trial court's statements in the context of the
 instructions and the record as a whole, it is reasonably
 likely that the jury understood the court's statements to
 allow a conviction based on a standard lower than beyond a
 reasonable doubt and that such an instructional error was
 structural, thereby requiring reversal.
 
 
 ¶54
 In so concluding, we are not persuaded by the People's
 reliance on our prior opinions in Johnson, ¶
 15, 436 P.3d at 533, and Deleon v. People, 2019 CO
 85, 449 P.3d 1135.
 
 
 ¶55
 In Johnson, ¶ 15, 436 P.3d at 533, we perceived
 no reversible error in a trial court's statements during
 voir dire regarding the meaning of "reasonable
 doubt" because we concluded that the challenged
 instruction was too nonsensical to be understood by the jury
 and that the jury would therefore have relied on the correct
 reasonable doubt instruction that the court gave. Here, in
 contrast, the crack-in-the-foundation example was a clear,
 real-world scenario that we believe
 
 
 25
 
 
 the jurors would readily have understood and relied on,
 particularly given that the court gave the example
 immediately after undermining the pattern reasonable doubt
 instruction.
 
 
 ¶56
 In Deleon, ¶ 1, 449 P.3d at 1136, the question
 before us was whether the trial court had reversibly erred in
 not instructing the jury regarding the defendant's right
 to remain silent (and the impropriety of the jurors'
 drawing any adverse inference against the defendant from his
 decision not to testify), notwithstanding the fact that the
 court had commented on this topic during voir dire. We
 concluded that the trial court had, in fact, reversibly
 erred. Id. In so concluding, we relied on the facts
 that (1) the court's comments during voir dire were made
 in the context of determining whether the potential jurors
 could act impartially and apply the law (and not in the
 context of instructing the jurors regarding the law); (2)
 prior to the parties' opening statements, the court told
 the jurors that the law that they were to follow "will
 be" presented to them and that the court's
 instructions should be the only basis for their verdict; and
 (3) when the court read its final instructions to the jurors,
 it told them that the instructions comprised the law the
 jurors were to follow, and the court gave no instruction on
 the defendant's right to remain silent. Id. at
 ¶¶ 15, 26-27, 449 P.3d at 1137-38, 1140.
 
 
 ¶57
 Notwithstanding the People's suggestion to the contrary,
 we did not say in Deleon that a trial court's
 statements in voir dire can never rise to the level of an
 
 
 26
 
 
 instruction on the applicable law (or, conversely, that they
 always do). Rather, just as we do here, we considered the
 court's statements in the context of the instructions as
 a whole and the entire record to determine whether the trial
 court had properly instructed the jury on the law to be
 applied. In Deleon, we concluded that the trial
 court had not done so, and we reach an analogous conclusion
 here. To be sure, the instructional issues in Deleon
 and the present case arose in very different settings.
 Nonetheless, the analytical framework that we employed in
 Deleon to assess the claimed error is consistent
 with the framework that we apply here.
 
 
 ¶58
 Finally, as to the People's reliance on the
 division's opinion in People v. Avila, 2019 COA
 145, ¶¶ 40-48, 457 P.3d 771, 779-81, to defend the
 trial court's statements here, although that case is
 arguably distinguishable on its facts, to the extent that its
 holding is inconsistent with the conclusion that we reach
 today, we overrule that opinion.
 
 
 III.
 Conclusion
 
 
 ¶59
 For the forgoing reasons, we adopt a functional test for
 deciding whether a trial court's statements to the jury
 regarding the law to be applied lowered the prosecution's
 burden of proof. Specifically, we ask whether there is a
 reasonable likelihood that the jury understood the
 court's statements, in the context of the instructions as
 a whole and the trial record, to allow a conviction based on
 a
 
 
 27
 
 
 standard lower than beyond a reasonable doubt. Applying that
 test to the specific facts presented here, in which the court
 equated the concept of reasonable doubt to the doubt that a
 prospective homebuyer would have upon observing a
 structurally significant, floor-to-ceiling crack in a
 home's foundation, we conclude that it is reasonably
 likely that the jury understood the court's statements to
 allow a conviction on a standard lower than beyond a
 reasonable doubt.
 
 
 ¶60
 Because this constitutes structural error, we reverse the
 judgment of the division below.
 
 
 28
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issues:
 
 
 1. Whether the trial court's example of reasonable
 doubt lowered the prosecution's burden of proof in
 violation of the defendant's constitutional rights to due
 process and a jury trial.
 
 
 2. Whether other factors occurring in the course of a
 trial mitigate the harm of an instruction that lowers the
 prosecution's burden of proof.
 
 
 3. Whether a trial court's comments during voir
 dire should be reviewed as "instructions" such that
 any improper comment could constitute structural error
 requiring automatic reversal.
 
 
 ---------