22CA1470 Peo v Montoya 12-05-2024

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 22CA1470
Jefferson County District Court No. 21CR1900
Honorable Tamara S. Russell, Judge

_____

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Jacob Montoya,

Defendant-Appellant.

_____

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHOCK
Fox and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 5, 2024

_____

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jeffrey A. Wermer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, James Jacob Montoya, appeals his conviction for sexual assault on a child by one in a position of trust.  We affirm.

## I.     Background

¶ 2     The charge in this case stemmed from a report by Montoya's former stepdaughter, B.M., that Montoya sexually assaulted her by touching her over her clothing when she was in seventh grade.

¶ 3     According to B.M.'s trial testimony, Montoya picked her up from school one day after she was sent home because a classmate reported she had purposefully cut herself the night before.  When the two got home, they sat on the living room couch.  As Montoya initially tried to comfort B.M., he began rubbing her leg, shoulders, and back.  He then moved his hands over her vagina and across her breasts.  B.M. left the couch and went to her sister's room.  She did not tell anyone what had happened because Montoya threatened that "he would hurt [her] or [her] siblings or [her] mom" if she did.

¶ 4     Two years later, when B.M. was in ninth grade and Montoya and B.M.'s mother had divorced, B.M. disclosed the assault to a teacher.  As part of a school assignment, B.M. wrote that she identified with a particular political party because she had been "raped twice."  The teacher spoke with B.M., and B.M. revealed that

1

one incident had involved her mother's ex-husband. The teacher reported what B.M. had told him, and the police became involved.

¶ 5 B.M. agreed to allow a detective to contact Montoya through an Instagram account in B.M.'s name. The detective, pretending to be B.M., exchanged a series of messages with Montoya. In that conversation, Montoya admitted he had been sexually attracted to B.M. but repeatedly denied any wrongdoing. Eventually, however, Montoya admitted he touched B.M.'s vagina over her clothes.

¶ 6 Montoya was charged with sexual assault on a child by one in a position of trust. A jury convicted him, and he was sentenced to seven years to life in the custody of the Department of Corrections.

## II.    Impeachment Evidence

¶ 7 Montoya first contends that the district court erred by excluding evidence of B.M.'s inconsistent statements about the order of the two alleged sexual assaults she had referenced in her school assignment. We perceive no abuse of discretion.

### A.    Additional Background

¶ 8 After B.M. wrote in her school assignment that she had been "raped twice," she told a social worker she was "first raped by a stranger" and later by Montoya. In a subsequent forensic interview,

2

B.M. reported that the assault by Montoya had occurred when she was twelve years old and that the other had occurred at a sleepover when she was fourteen years old.  As to the latter, B.M. said she woke up to "an unknown person running his hands up and down her back and hips and thrusting their pelvis into her backside."

¶ 9     Montoya moved before trial to admit these statements under section 18-3-407, C.R.S. 2022 (the rape shield statute).[1]  Defense counsel's primary argument was that the sleepover incident had been fabricated and demonstrated a history of false reporting by B.M.[2]  But defense counsel also argued that the statements were relevant to B.M.'s credibility because they showed B.M. had given inconsistent timelines of the two assaults.  She originally said she was raped by a stranger and *then* assaulted by Montoya, but later said she was assaulted by Montoya two years before the sleepover.

¶ 10    The district court denied Montoya's motion and excluded B.M.'s statements about the sleepover.  The court found that there

---

[1] The rape shield statute has been amended since Montoya's trial. *See* § 18-3-407, C.R.S. 2024.  We apply the version of the statute in effect at the time of trial.  *People v. Ramcharan*, 2024 COA 110, ¶ 2.

[2] Montoya does not pursue his argument that the sleepover incident was admissible as a prior incident of false reporting on appeal.

was no evidence the report of the sleepover incident was false and that the incident was "completely irrelevant" if it was true.

¶ 11    As to the timing of the two incidents, the court noted that a change in the timeline "would be of evidentiary value," and it asked defense counsel if it would be possible to bring out the apparent inconsistency without referring to the sleepover. When defense counsel said it would not be, the court excluded all evidence of B.M.'s statements about the second alleged assault. The court explained: "I do know there's some value to that information . . . that she got it out of the wrong timeline, but I think that it is way more prejudicial than it is probative, so we're not letting that in."

## B.    Applicable Law and Standard of Review

¶ 12    The rape shield statute deems most evidence of a victim's prior or subsequent sexual conduct presumptively irrelevant. *See* § 18-3-407(1); *People v. Weiss*, 133 P.3d 1180, 1185 (Colo. 2006). Before such evidence may be offered at trial, it must go through a pretrial procedure that requires a written motion, an affidavit, an offer of proof, and if necessary, an in camera hearing on disputed facts. § 18-3-407(2). Such evidence is admissible only if the court finds that it is "relevant to a material issue to the case." § 18-3-407(2)(e).

4

¶ 13 Evidence proffered under the rape shield statute is "subject to relevancy and prejudice limitations under CRE 401 and 403." *People v. Sims*, 2019 COA 66, ¶ 45. Evidence is relevant if it has "any tendency to make the existence of a fact of consequence more or less probable." *People v. Hood*, 2024 COA 27, ¶ 19; *see also* CRE 401. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, issue confusion, or misleading the jury. CRE 403; *see also Hood*, ¶ 19.

¶ 14 The district court has broad discretion to determine the admissibility of evidence based on its relevance, probative value, and prejudicial impact. *People v. Elmarr*, 2015 CO 53, ¶ 20. In particular, the district court exercises broad discretion in balancing the probative value of the evidence against the danger of unfair prejudice. *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995).

¶ 15 We review a district court's evidentiary rulings, including under the rape shield statute, for an abuse of discretion. *Hood*, ¶ 6. A district court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.* In reviewing a district court's ruling under CRE 403, we afford

the evidence its maximum reasonable probative value and its minimum reasonable prejudicial effect. *Gibbens*, 905 P.2d at 607.

## C. Analysis

¶ 16 Montoya acknowledges that the rape shield statute applies to B.M.'s statements. But he argues that the district court erred by excluding the statements because they were relevant and material impeachment evidence and their relevance was not substantially outweighed by the danger of unfair prejudice. We disagree.

¶ 17 We agree with the People that the probative value of the inconsistent statements was low. It is true that a witness's credibility is always relevant, particularly in a case like this one that turned on B.M.'s account. *Margerum v. People*, 2019 CO 100, ¶ 12. And one way to challenge a witness's credibility is by impeaching the witness with prior inconsistent statements. CRE 613. But the statements in question do not evince any inconsistency in B.M.'s account of the *charged* assault, or even when it occurred. At most, they concern a potential inconsistency in the timing of a *different* assault — one the court found no reason to believe was fabricated based on information presented by the prosecution — in relation to

the charged assault. Such an inconsistency would have done little to undermine B.M.'s credibility as to the charged assault.

¶ 18     Indeed, any inconsistency in the timing of a different assault would have been less probative than the arguable inconsistencies in B.M.'s account of the charged assault itself, on which defense counsel *did* cross-examine B.M. For example, defense counsel elicited that B.M. (1) did not state in her interview that Montoya had threatened her; (2) initially described the assault as a "rape"; (3) said in her statement that Montoya "had just brushed against [her]"; and (4) indicated in her interview that Montoya had touched the back of her thigh, even though they were sitting down at the time. In light of these and other subjects of cross-examination, any incremental probative value of showing B.M. might have mixed up the sequence of *another* assault would have been marginal at best.

¶ 19     On the other hand, the prejudicial effect on B.M., including the unnecessary invasion of her privacy, would have been substantial. *See People v. Melillo*, 25 P.3d 769, 776-77 (Colo. 2001) (holding that the CRE 403 balancing test may take into account the policy concerns underlying the rape shield statute, including "the unnecessary invasion of privacy and emotional abuse" of the

victim).  Defense counsel conceded that, if the statements in question were admitted, B.M.'s account of the sleepover assault would also need to be admitted.  In other words, B.M. would be required to testify about an entirely unrelated assault as the price of testifying about this one.  That is exactly the kind of prejudice the rape shield statute was designed to protect against.  *Id.*; *see also People v. McKenna*, 585 P.2d 275, 278 (Colo. 1978) (noting that rape shield statute reflects policy that "victims of sexual assaults should not be subjected to psychological or emotional abuse in court as the price of their cooperation in prosecuting sex offenders").

¶ 20    Montoya contends that embarrassment to the victim is not a proper consideration under CRE 403.  But *Melillo* held that it is.[3] 25 P.3d at 776 ("The substantive policy concerns underlying the rape shield statute speak to the prejudicial nature of evidence of a rape victim's prior sexual conduct.").  And *Pierson v. People*, 2012 CO 47, does not suggest otherwise.  That case simply confirms that

---

[3] Montoya incorrectly suggests that the discussion of prejudice in *People v. Melillo*, 25 P.3d 769, 776-77 (Colo. 2001), was dicta.  It was not.  The court held that the defendant's offer of proof was insufficient under the rape shield statute precisely *because* "the probative value of the proffered evidence [was] substantially outweighed by the risk of prejudice to the victim."  *Id.* at 777.

the rape shield statute does not "alter[] the required balancing of probativeness and countervailing considerations enumerated in CRE 403." *Id.* at ¶ 14. It does nothing to call into question *Melillo*'s discussion of what those countervailing considerations are.[4]

¶ 21 Montoya also asserts that the statements should have been admitted under the rule of completeness to avoid giving the jury a misleading impression of B.M.'s allegations. *See* CRE 106. But the rule of completeness has limited applicability in the rape shield context "in light of the highly prejudicial nature of evidence relating to a rape victim's prior sexual conduct." *Melillo*, 25 P.3d at 776; *see also People v. Villa*, 240 P.3d 343, 356 (Colo. App. 2009) ("The rule of completeness does not establish in and of itself the admissibility of evidence that is protected by the rape shield statute."). That is because the rule of completeness is subject to "the same considerations of relevancy and potential prejudice" that govern

---

[4] We note that the recent amendment to the rape shield statute makes this point explicit, providing that evidence may be introduced only if the court finds "that the probative value of the evidence is not substantially outweighed by the probability that its admission will create unfair prejudice, confusion of the issues, misleading of the jury, or *unfair invasion of the privacy of the victim or witness.*" § 18-3-407(2)(e), C.R.S. 2024 (emphasis added).

other evidence. *Melillo*, 25 P.3d at 775. Thus, because the record supports that the probative value of the proffered evidence was substantially outweighed by the risk of prejudice to the victim, that evidence could not be saved by the rule of completeness. *Id.* at 777.

¶ 22 The district court therefore did not abuse its discretion in excluding evidence of B.M.'s purportedly inconsistent statements concerning the order of the two alleged sexual assaults.

### III. Victim Impact Evidence

¶ 23 Montoya next contends that the district court reversibly erred by admitting a portion of the Instagram conversation between him and the detective pretending to be B.M., in which the detective said she had "cut a lot more" the night of the incident. Montoya argues that this statement was irrelevant victim impact evidence and was unfairly prejudicial because it suggested that B.M. had engaged in self-harm as a result of the sexual assault. We again disagree.

### A. Additional Background

¶ 24 Before trial, the prosecution moved to admit the entirety of the Instagram conversation between Montoya and the detective posing as B.M. The prosecution argued that the messages included several admissions by Montoya that were intrinsic to the charged offense,

as well as statements about other acts that were admissible under CRE 404(b) and section 16-10-301, C.R.S. 2024.

¶ 25 Defense counsel objected to the entire exhibit as "overly prejudicial" and not sufficiently probative "to overcome the prejudicial factor." The district court opted to walk through the conversation page by page, allowing the parties to make objections or arguments concerning the admissibility of particular statements.

¶ 26 At one point in the conversation, the detective (acting as B.M.) said to Montoya, "After you touched my boob I cut a lot more that night because it was so confusing." Montoya responded: "If I did anything to harm you I'm very sorry it was unintentional and I never intentionally did anything wrong to you girls." Defense counsel objected to the detective's statement as follows:

> [DEFENSE COUNSEL]: [I]t may be a limiting instruction would be appropriate, if this is going to come in. But it does make comments like, "assuming that he had touched her boob" or that "she had been cutting herself."
>
> THE COURT: "After you touched my boob."
>
> [DEFENSE COUNSEL]: Yeah. It almost implies that those are factual –
>
> THE COURT: Implies it happened.

11

[DEFENSE COUNSEL]: Yes. So that is a concern.

¶ 27    In a written order, the district court ruled that this statement was admissible, concluding that it was (1) intrinsic to the charged crime because it was a direct allegation regarding the charged crime and (2) not more prejudicial than probative because Montoya denied the accusation. The statement was included in the copy of the Instagram conversation that was admitted as an exhibit at trial.

### B.    Preservation and Standard of Review

¶ 28    We first note that Montoya did not preserve his argument that the challenged statement constituted inadmissible victim impact evidence. *See People v. Martinez*, 2020 COA 141, ¶ 33. He objected to the entirety of the conversation as "overly prejudicial" for several reasons, none of which included the apparent impact of the crime on B.M. Then, he objected to the specific statement only on the ground that it implied the embedded factual assertions — including the assertion that Montoya had "touched her boob" — were true.

¶ 29    Montoya did not argue, as he does on appeal, that the statement was inadmissible because it described the impact of the crime on the victim. Thus, while Montoya preserved his general

12

objections to relevancy and unfair prejudice, he did not preserve the specific argument that the statement in question was victim impact evidence.[5] *See People v. Tallent*, 2021 CO 68, ¶ 12 ("When a party presents a new argument or alters the grounds for an objection on appeal, the issue is forfeited and reviewable only for plain error.").

¶ 30    We review the district court's evidentiary rulings for an abuse of discretion. *Martinez*, ¶ 25. When an evidentiary argument is unpreserved, we will reverse only for plain error. *People v. Snelling*, 2022 COA 116M, ¶ 33. Plain error is "obvious and substantial" error that "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 18 (citation omitted).

## C.    Analysis

¶ 31    We first reject Montoya's characterization of the message sent by the detective, posing as B.M., as victim impact evidence. Victim impact evidence is evidence that relates to "the victim's personal

---

[5] Because we conclude that the district court did not abuse its discretion in admitting the statement, the result would be the same even if the argument was preserved. *See Hagos v. People*, 2012 CO 63, ¶¶ 9, 14 (explaining that preservation only affects the "standard[] to determine whether an error in criminal proceedings necessitates reversal of the judgment of conviction").

characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." *Martinez*, ¶ 29 (citation omitted). Such evidence is generally inadmissible at trial because "the effect of a crime on a victim or the victim's family often has no tendency to prove whether a particular defendant committed a particular criminal act against a particular victim." *Id.* at ¶ 33 (citation omitted). The admissibility of such evidence "turns on whether the evidence is relevant to determining whether the defendant committed the crime for which he or she is charged." *Id.*

¶ 32     The message in question said that B.M. "cut a lot more [the night of the charged assault] because it was so confusing." If the statement had been made by B.M., it might be victim impact evidence. *See id.* at ¶ 39 (noting that testimony was victim impact evidence because it described the physical and emotional toll that the alleged sexual assault took on the victim). But the evidence at trial was unequivocal that it was not. Before the messages were admitted, the detective explained that she was the one communicating with Montoya, that B.M. was not involved, and that B.M. was not privy to what was said. B.M. similarly testified that she had never accessed the account or seen any of the messages.

¶ 33    Nor did the evidence otherwise suggest that B.M. had in fact cut herself the night of the assault. Although the detective testified that she drew certain details for the conversation from B.M.'s forensic interview — including that someone "saw all [her] cuts from school" *before* the assault — she never suggested that *this* statement had come from B.M. Indeed, while the statement was included in the admitted exhibit, neither the detective nor the prosecution ever mentioned it at all. Thus, the statement cannot fairly be construed as describing the actual effect on the victim.

¶ 34    Instead, the statement was relevant to provide context for Montoya's denial — and eventual admission — of the charged offense. Although Montoya focuses on appeal on the second part of the statement — "I cut a lot more that night" — the primary focus in the district court was on the first part — "[a]fter you touched my boob." The district court properly exercised its discretion in concluding that this statement as a whole, together with Montoya's response, was relevant as direct evidence of the charged offense.

¶ 35    The district court also did not abuse its discretion by concluding that the probative value of the statement was not substantially outweighed by the danger of unfair prejudice. *See*

15

*Gibbens*, 905 P.2d at 607.  Without some factual basis for the statement — either that B.M. had made the statement or that she had in fact engaged in cutting after the assault — we see no reason why it would have provoked outrage against Montoya or elicited sympathy for B.M.  *See Martinez*, ¶ 37.  The potential prejudice would come from the fact that B.M. had cut herself, not that a detective told Montoya she had.  And even if the statement could somehow be construed to suggest that B.M. had engaged in self-harm after the assault, there was other evidence — elicited by defense counsel — that she had been doing so before the assault, thus "blunt[ing] the prejudicial force" of the evidence.  *Id.* at ¶ 44.

¶ 36    Finally, even if we were to conclude that the challenged portion of the statement should have been excised, any error would be harmless (and to the extent unpreserved, not substantial).  *See Snelling*, ¶¶ 32-33.  The statement was one part of one message in a sixty-six-page exhibit consisting of hundreds of messages.  It was never mentioned at trial — not in the testimony itself and not in opening or closing.  And there was no other evidence that B.M. engaged in self-harm after the assault.  *See Martinez*, ¶¶ 43-44 (holding that erroneous admission of victim impact evidence was

16

harmless where it "constituted, at most, a few minutes of [the] three-day trial," "the prosecutor did not unduly highlight the victim impact evidence," and the victim's history of depression and alcohol use indicated that her "close suicidal scare" could have been caused by factors other than the alleged sexual assault). We also "assume the jury heeded the court's instruction not to be influenced by sympathy, bias, or prejudice in reaching its decision." *Id.* at ¶ 44.

¶ 37 Thus, we conclude that the district court did not abuse its discretion by admitting the challenged statement as part of the Instagram conversation between the detective and Montoya. And in any event, the purported error would not be a basis for reversal.

## IV. Jury Instruction

¶ 38 Montoya also argues that the district court's reasonable doubt and elemental instructions impermissibly lowered the prosecution's burden of proof by telling the jury that if the prosecution failed to prove the elements of the offense, the jury should — rather than must — find the defendant not guilty. We are not persuaded.

## A. Additional Background

¶ 39 Before trial, the prosecution submitted a proposed jury instruction on the burden of proof that was consistent with

17

Colorado's model jury instructions. It provided, in relevant part: "If you find from the evidence that the prosecution has failed to prove any one or more elements of a crime beyond a reasonable doubt, you should find the defendant not guilty of that crime."

¶ 40    Defense counsel objected to the instruction on the ground that it misstated the law by suggesting that "it's up to [the jury] if [the People] haven't proved the case, that they may or may not choose to find him not guilty." She requested that the word "should" be changed to "must" to clarify that "[i]f the jury finds the elements have not been proven beyond a reasonable doubt, they must return a verdict of not guilty." Defense counsel made the same objection to the elemental instruction, which contained similar language.

¶ 41    The district court denied the objections, declining to depart from the language of the model jury instructions. The court instructed the jury regarding the burden of proof as follows:

> If you find from the evidence that each and every element of a crime has been proven beyond a reasonable doubt, you should find the defendant guilty of that crime. If you find from the evidence that the prosecution has failed to prove any one or more of the elements of a crime beyond a reasonable doubt, you should find the defendant not guilty of that crime.

18

¶ 42    In the elemental instruction, the district court instructed the

jury as follows:

> After considering all the evidence, if you decide
> the prosecution has proven each of the
> elements beyond a reasonable doubt, you
> should find the defendant guilty of sexual
> assault on a child by one in a position of trust.
>
> After considering all the evidence, if you decide
> the prosecution has failed to prove any one or
> more of the elements beyond a reasonable
> doubt, you should find the defendant not
> guilty of sexual assault on a child by one in a
> position of trust.

### B.    Applicable Law and Standard of Review

¶ 43    The United States Constitution "protects the accused against

conviction except upon proof beyond a reasonable doubt of every

fact necessary to constitute the crime with which he is charged." *In

re Winship*, 397 U.S. 358, 364 (1970).  Thus, the jury must be

instructed that "it may return a guilty verdict only if sufficient proof

has been submitted to satisfy the [beyond a reasonable doubt]

standard." *People v. Munoz*, 240 P.3d 311, 316 (Colo. App. 2009).

An instruction that lowers the prosecution's burden of proof

constitutes structural error.  *Tibbels v. People*, 2022 CO 1, ¶ 22.

¶ 44 We review de novo whether the district court correctly instructed the jury, including whether its instructions lowered the prosecution's burden of proof. *Id.* In conducting this review, "we ask whether there is a reasonable likelihood that the jury applied the contested instruction in an unconstitutional manner." *Johnson v. People*, 2019 CO 17, ¶ 14. We do not consider jury instructions in isolation but in the context of the instructions as a whole. *Id.*

## C. Analysis

¶ 45 A division of this court has previously rejected the argument Montoya makes in this case. *Munoz*, 240 P.3d at 317-19. In *Munoz*, the defendant argued, as Montoya does here, that the word "should" in the reasonable doubt and elemental instructions lowered the prosecution's burden of proof by leaving a not guilty verdict to the jury's discretion. *Id.* at 317. The division rejected that argument, concluding that "the common meaning of 'should' conveys an obligatory command and not a permissive request and . . . adequately informed the jury of its obligation to adhere to the reasonable doubt standard in deciding defendant's guilt." *Id.*

¶ 46 We find *Munoz* persuasive and see no reason to depart from it. Montoya argues that *Munoz* is wrong because (1) its conclusion that

20

the word "should" conveys an obligatory duty was grammatically incorrect; (2) the out-of-state cases on which it relied were unpersuasive; and (3) its rationale for distinguishing sentencing guideline cases construing "should" as permissive was misplaced. We have considered these arguments but conclude they do not undermine *Munoz*'s overarching holding that the word "should" *in this context* "properly instructed the jury that it was obligated to find defendant not guilty if the prosecution failed to prove defendant's guilt beyond a reasonable doubt." *Id.* at 318.

¶ 47 Montoya also argues that *Munoz* is distinguishable because the jury in that case received a separate instruction that it "*will* find the defendant not guilty" if the prosecution did not meet its burden of proof. *Id.* But that instruction was not essential to the division's conclusion; it was simply one additional factor to support that conclusion. *Id.*; *see also People v. Waller*, 2016 COA 115, ¶ 72 (holding that "use of the term 'should' . . . is no less obligatory than the use of the word 'will' in the reasonable doubt instruction"). And another instruction the *Munoz* division cited as support — that the jurors "must follow all of the rules" as explained by the court — *was* given in this case when the jury was told that its "decision

21

must be made by applying the rules of law that [the court] give[s] it to the evidence presented at trial." *See Munoz*, 240 P.3d at 318.

¶ 48     Moreover, the jury in this case was instructed that "[e]very person charged with a crime is presumed innocent" and that "this presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all of the evidence, you are then convinced that the defendant is guilty beyond a reasonable doubt." The necessary corollary of this instruction is that if the jury was *not* convinced the defendant was guilty beyond a reasonable doubt, he would be presumed innocent and, consequently, must be found not guilty.

¶ 49     Thus, reading the challenged jury instructions in the context of the instructions as a whole, we conclude that there is no reasonable likelihood that the jurors "interpreted the word 'should' to mean that they could base their decision on their own discretion or that they were free to find defendant guilty even if the prosecution did not meet its burden of proof." *Id.* at 318-19.

## V. Cumulative Error

¶ 50    Finally, because we have concluded there was no error at trial, we reject Montoya's argument that cumulative error deprived him of a fair trial. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25.

## VI. Disposition

¶ 51    The judgment is affirmed.

JUDGE FOX and JUDGE JOHNSON concur.