23CA2031 Peo v Tapia 05-14-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2031
City and County of Denver District Court No. 22CR1855
Honorable Adam J. Espinosa, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Vincent S. Tapia,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Suzan Trinh Almony, Alternate Defense Counsel, Broomfield, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Vincent S. Tapia, appeals the trial court's judgment of conviction entered on a jury verdict finding him guilty of second degree murder.  We affirm the judgment.

## I.    Background and Procedural History

### A.    Incident and Arrest

¶ 2    Tapia and Ricardo Santos, the victim, were friends who grew up together.  On the evening of April 1, 2022, Santos and Tapia drove in Santos's car and picked up Isabella Lara-Tello and Leanel Martinez.  Tapia was in the front passenger seat and Lara-Tello and Martinez were in the back.  Martinez testified that she and Tapia were Facebook acquaintances who had met up a few times in person.  Lara-Tello was Martinez's friend and had not previously met Santos or Tapia.

¶ 3    Martinez testified that, on the way to a nightclub, while Santos was driving, Santos and Tapia passed around a tequila[1] bottle, and they all took turns drinking from it.  There was also testimony

---

[1] The state's toxicology expert performed a retrograde extrapolation on Tapia and determined that his blood alcohol concentration (BAC) was .272 at the time of the shooting.

about smoking marijuana. Martinez testified that she saw Santos pass a revolver to Tapia while they were in the car.

¶ 4 Santos collided with another car stopped at a red light. Santos drove away from the accident scene, and Santos and Tapia argued about who was responsible for the accident (there was some suggestion that Tapia may have grabbed the steering wheel). Santos allegedly told Tapia that he had to either agree to pay part of the repair expenses or fight him. Santos pulled over, and he and Tapia got out of the car. Anticipating that Santos and Tapia were about to fight, Martinez also got out of the car and called a friend. Lara-Tello remained in the car. Santos and Tapia got into a fist fight, and, at some point, Tapia pulled out the handgun and fired it twice at Santos. One bullet struck Santos's neck.

¶ 5 Tapia ran away. Lara-Tello cradled Santos's head and applied pressure to the wound while Martinez called the police. When the officers arrived, Martinez showed the officers Tapia's Facebook profile. Santos was taken from the scene by ambulance shortly after police were called but ultimately succumbed to his injuries at the hospital.

¶ 6    At around 11:40 p.m., police officers located Tapia about six blocks away from the shooting and handcuffed him.  Officer Vincent Lombardi read Tapia his *Miranda* rights and asked him if he would like to talk to the officers.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A visibly intoxicated Tapia initially said that he wanted to talk to his mother but eventually talked to Lombardi.  The officers later took Tapia into custody.

¶ 7    Just before 4 a.m., Tapia was interviewed again at the police station by Detective Mark Crider.  Before Crider entered the room, Tapia was asleep at a table and still appeared to be intoxicated.  Crider read Tapia his *Miranda* rights.  Tapia indicated that he understood the advisement and signed the *Miranda* waiver as "yessi, Vinvent twentyy."  Crider then interrogated Tapia.  Tapia was subsequently charged with first degree murder.

## B.    Trial and Conviction

¶ 8    The court set the case for a jury trial.  On the day of trial, Tapia, for the first time, told the court that there was a conflict between him and his attorneys and moved for a continuance so that he could retain private counsel.  The court emptied the courtroom and found a judge who was available to conduct a *Bergerud*

3

hearing. *See People v. Bergerud*, 223 P.3d 686 (Colo. 2010). The judge who conducted the hearing found that there was no conflict between Tapia and his appointed counsel.

¶ 9 Tapia thereafter renewed his continuance motion with the trial court, which it denied based on the last-minute nature of the motion, the fact that this case had already been continued on one other occasion, and strong objections from Santos's family — some of whom travelled from out of state.

¶ 10 The case proceeded to trial. The jury convicted Tapia of second degree murder, and the trial court sentenced him to forty years in the custody of the Department of Corrections.

## II. Motion to Suppress

¶ 11 Tapia contends that the trial court erred by failing to suppress body camera (bodycam) footage of Tapia making incriminating statements to Officer Lombardi and video footage of his statements to Detective Crider. We address each contention in turn.

### A. Standard of Review and Applicable Law

¶ 12 Generally, we review a trial court's ruling on a motion to suppress as a mixed question of law and fact. *Gow v. People*, 2019 CO 30, ¶ 13. We defer to the court's factual findings if they are

4

supported by the record but review its legal conclusions de novo. *Id.* If the statements sought to be suppressed are recorded, however, we may independently review the recording. *See People v. Kutlak*, 2016 CO 1, ¶ 13. In such circumstances, we are in the same position as the trial court to weigh the import of the recording, and assuming other material facts are not disputed, our entire review is de novo. *People v. Sellers*, 2022 COA 102, ¶ 9, *aff'd on other grounds*, 2024 CO 64.

¶ 13 Defendants in criminal cases enjoy a constitutional right against self-incrimination. U.S. Const. amend. V; Colo. Const. art. II, § 18; *Miranda*, 384 U.S. at 444; *People v. Aguilar-Ramos*, 86 P.3d 397, 400 (Colo. 2004). Under *Miranda*, the prosecution may not use a statement obtained by police during a custodial interrogation in its case-in-chief unless the suspect was advised of, and validly waived, their Fifth Amendment rights. *People v. Alemayehu*, 2021 COA 69, ¶ 73 (citing *People v. Wood*, 135 P.3d 744, 749 (Colo. 2006)).

¶ 14 The prosecution must show by a preponderance of the evidence that any waiver was valid. *People v. Smiley*, 2023 CO 36, ¶ 15 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 383-84 (2010)).

"A waiver is knowing and intelligent when made with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *People v. Platt*, 81 P.3d 1060, 1065 (Colo. 2004); *People v. Hopkins*, 774 P.2d 849, 851 (Colo. 1989).

¶ 15 Generally, to determine whether a waiver is knowing and intelligent, courts may consider various factors:

> (1) the lapse of time between an initial *Miranda* advisement and a subsequent interrogation, (2) the extent to which a suspect has been informed or is aware of the subject matter of the interrogation prior to its commencement, (3) whether the accused or the interrogating officer initiated the interview, (4) whether and to what extent the accused was reminded of his rights prior to the interrogation, (5) the clarity and form of the defendant's acknowledgement and waiver, if any, and (6) the background and experience of the accused in connection with the criminal justice system.

*People v. Humphrey*, 132 P.3d 352, 356 (Colo. 2006).

¶ 16 A defendant's intoxication level at the time of their *Miranda* waiver is relevant to the waiver analysis. *People v. Knedler*, 2014 CO 28, ¶ 14. If the defendant was intoxicated, the court may consider additional factors to determine whether the *Miranda* waiver was knowing and intelligent, including whether the defendant

6

- appeared oriented to their surroundings and situation;

- answered questions in a way that was responsive and rational;

- appreciated the seriousness of their predicament, including the possibility of being incarcerated;

- attempted to deceive the police;

- expressed remorse for their conduct; and

- expressly stated that they understood their rights.

*Platt*, 81 P.3d at 1066; *Knedler*, ¶ 14.

### B.  Officer Lombardi Video

¶ 17  Tapia contends that the trial court's failure to suppress the bodycam footage in which he speaks to Officer Lombardi while handcuffed was reversible error.  We discern no error with the trial court's ultimate conclusion.

### 1.  Additional Facts

¶ 18  Lombardi's bodycam footage, which started recording at around 11:40 p.m., was approximately ten minutes long and showed Tapia surrounded by police officers, handcuffed, and leaning against a police car.  Tapia appeared nervous and distressed but responded appropriately to officers' commands.

¶ 19    Tapia made eye contact with Lombardi and started to ask him a question.  Lombardi interrupted Tapia before he could ask the question and asked Tapia his age.

¶ 20    Tapia said that he was nineteen years old,[2] and Lombardi started advising him of his *Miranda* rights.  After Lombardi told Tapia that he had the right to remain silent, Tapia, through slurred speech, interrupted Lombardi and said, "I know, I just want to talk to my mom."  Lombardi instructed Tapia to listen to the rest of the advisement and asked him whether he understood the first part of the advisement.  Tapia responded that he understood, and Lombardi continued advising him of his right to counsel.

¶ 21    Tapia did not maintain eye contact throughout the entire advisement and appeared distracted.  When Lombardi finished the advisement, he asked Tapia whether he would like to talk to him.  Tapia responded, "I understand, yes, no I don't want to talk to you, I want to talk to my mom."  Tapia then restated that he only wanted to talk to his mom.  Tapia then remained silent for about ten seconds.

---

[2] Tapia was actually twenty.

¶ 22 Lombardi again asked Tapia if he wanted to talk about what happened, and Tapia responded, "That's up to you officer." Tapia then proceeded to tell Lombardi that he ran off with the gun and talked about details of the shooting and his relationship with Santos.

¶ 23 The trial court held an evidentiary hearing on the motions to suppress. Lombardi testified that he was one of the responding officers who spotted Tapia running from the crime scene. Lombardi testified that Tapia was slurring his words when Lombardi first encountered him and that he told officers that he had been drinking.

¶ 24 The trial court denied defense counsel's motion after finding that, under the totality of the circumstances, Tapia knowingly, intelligently, and voluntarily[3] waived his *Miranda* rights. Specifically, the court found as follows:

- Lombardi properly advised Tapia and asked him whether he understood the advisement.

---

[3] On appeal, Tapia does not contend that his statements were involuntary.

- Tapia did not appear to be intoxicated, at least not to the degree that raised significant concerns about whether he could knowingly, intelligently, or voluntarily waive his *Miranda* rights.

- Tapia understood and responded appropriately to the questions, despite repeatedly interrupting Lombardi.

- The recorded conversation was brief, and Lombardi did not engage in any conversations that appeared off camera.

- Even though he asked to speak to his mom, at no point did Tapia affirmatively invoke his right to remain silent or ask for a lawyer, and Lombardi did not engage in any coercive conduct or make any promises or threats.

### 2. Analysis

¶ 25    On appeal Tapia contends that the trial court erred by finding that he knowingly and intelligently waived his *Miranda* rights before speaking to Officer Lombardi. Tapia relies on the visible signs of his intoxication, including his slurred speech, his repeated interruptions of Lombardi during the advisement, and his three requests for his mother during and shortly after Lombardi's

recitation of the advisement. Furthermore, Tapia contends, Lombardi asked a follow-up question after Tapia stated he didn't want to talk to Lombardi and wanted to talk to his mom.

¶ 26 The People argue that the trial court correctly found that Tapia knowingly and intelligently waived his rights because Tapia was not too intoxicated to make a knowing and intelligent decision whether to speak with officers, never invoked his right to remain silent, and "never declined to speak" to Lombardi.

¶ 27 We acknowledge that the court incorrectly stated that Tapia never declined to speak to Lombardi because, immediately after Lombardi finished the *Miranda* advisement, he asked Tapia if he wanted to talk to him, and Tapia initially said "no." However, despite the court's misstatement, we conclude that it did not err by finding that Tapia's waiver was knowing and intelligent.

¶ 28 First, we reject Tapia's argument that he unequivocally asserted his right to remain silent, and that Lombardi's subsequent questions were therefore improper. *See People v. Torres*, 2026 CO 15, ¶ 21 ("[I]f the suspect invokes their right to remain silent or their right to counsel, officers must scrupulously honor their invocation of that right."). In order to invoke the right to remain

11

silent under *Miranda,* a defendant is not required to use "special or ritualistic phrases." *People v. Cerda*, 2024 CO 49, ¶ 24 (quoting *People v. Arroya*, 988 P.2d 1124, 1132 (Colo. 1999)).  However, the burden is on the defendant to articulate the desire to remain silent so that a reasonable officer in the circumstances would understand that the defendant was asserting that right.  *Id.*

¶ 29    Recall that after providing the *Miranda* advisement, Lombardi asked Tapia if he would like to speak with him.  Tapia responded, "I understand, yes, no I don't want to talk to you, I want to talk to my mom."  Lombardi stepped away but returned to Tapia shortly thereafter and asked, "Do you want to talk about what happened?" Tapia responded, "That's up to you officer."  Lombardi asked a follow-up question, and from there Tapia answered all of Lombardi's questions without invoking his right to remain silent.

¶ 30    We conclude that Tapia's statements about not wanting to speak with Lombardi were ambiguous.  *See id.* at ¶ 27 (a purported invocation of one's *Miranda* rights is ambiguous if it creates opposing inferences).  Indeed, Tapia initially answered "yes" and then immediately said "no."  Under these circumstances, we conclude that Lombardi's follow-up clarifying question was proper.

12

*See Arroya*, 988 P.2d at 1134-35 (explaining that officers may continue questioning if a suspect's request is ambiguous or equivocal). And after that question, Tapia never unequivocally invoked his right to remain silent. Thus, Lombardi's subsequent questions were not improper.

¶ 31    As it relates to Tapia's intoxication, despite Lombardi's testimony that Tapia did not appear intoxicated, we conclude from our review of the bodycam footage that Tapia did in fact appear intoxicated. Even if, as Lombardi testified, he did not smell alcohol on Tapia's breath, Tapia admitted to drinking and was obviously slurring his speech. However, and critically, the voluntariness analysis does not turn on whether Tapia was intoxicated; the pertinent question is whether his intoxication invalidated his *Miranda* waiver. Applying the *Platt* factors, we conclude that under the totality of the circumstances, there was evidence to support a conclusion that Tapia's intoxication did not rise to the level that he was incapable of knowingly and intelligently waiving his *Miranda* rights. *See Platt*, 81 P.3d at 1066.

¶ 32    Although Tapia looked distressed and concerned for the duration of the video, he spoke respectfully to the officers and

13

proffered explanations and justifications for running away from the car. These behaviors and statements suggest that Tapia was aware of his surroundings and the situation. Tapia also gave an explanation that attempted to deceive the officers, which reflects that he understood the gravity of the situation.

¶ 33 As the trial court noted, Tapia also answered the questions asked by Lombardi, despite the slurring, in a way that was responsive and rational. When asked whether he understood the waiver and wished to talk to Lombardi, Tapia responded with the yes/no response previously summarized. Tapia then remained silent for around ten seconds. When asked a follow-up question, Tapia started talking and never refused to answer any questions. Moreover, his answers were largely responsive to Lombardi's questions. Therefore, under the totality of the circumstances, we discern no error with the trial court's ultimate finding that Tapia was able to knowingly and intelligently waive his *Miranda* rights. *Id.*

¶ 34 Because Tapia's intoxication was not so pronounced that he could not knowingly or willingly waive his *Miranda* rights, and Lombardi's follow-up questions were not improper, we discern no

14

error in the trial court's order denying the motion to suppress Lombardi's bodycam footage.

### C.   Detective Crider Interview

¶ 35    Tapia also appeals the trial court's finding that his statements to Detective Crider were knowing and intelligent and therefore admissible.  Again, we discern no error.

#### 1.    Additional Facts

¶ 36    Shortly before 4 a.m. — approximately three and a half hours after Tapia's conversation with Officer Lombardi — Detective Crider interviewed Tapia.  Before Crider entered the interrogation room, Tapia appeared to be sleeping or resting his head on the table.  Crider asked Tapia if he needed water, and Tapia responded, "No."  Crider then walked Tapia through a written *Miranda* advisement and asked him if he understood the advisement.  Tapia indicated that he understood.  Crider then asked him to sign the advisement in different places.

¶ 37    In the section where Tapia was asked whether he understood the rights that were read to him, Crider wrote "Yes sir" as Tapia's "Answer," and Tapia then signed his name as "yessi, Vinvent twentyy."  On another signature block, he signed his name as

15

"XXXIXX." Crider proceeded to question Tapia for around forty minutes.

¶ 38     Defense counsel moved to suppress the interview on the basis that Tapia was too intoxicated to waive his *Miranda* rights under the circumstances. At the motions hearing, both sides heavily litigated Tapia's alleged intoxication level, but Tapia offered no evidence regarding the level of his blood alcohol concentration (BAC).

¶ 39     The trial court denied the motion after finding that Crider correctly advised Tapia of his *Miranda* rights and verified his signature, and that the manner and length of the interview did not cause any concerns about whether Tapia knowingly, voluntarily, and intelligently waived his rights.

¶ 40     Two months after the motions hearing, defense counsel submitted a motion to reconsider along with an expert report opining that Tapia's BAC level was believed to be between .26 and .29 when he spoke to Officer Lombardi — which occurred shortly after the shooting — and between .111 and .29 when he spoke to Crider. The prosecution asked the court to deny the motion because the court had previously considered evidence that Tapia

consumed marijuana and alcohol and concluded that Tapia's level of intoxication did not render his statements unknowing or unintelligent.

¶ 41 The trial court denied the motion to reconsider, incorporating its prior findings. The court also concluded that the belated evidence concerning Tapia's potential BAC level at the time of the Crider interrogation did not change its prior analysis.

## 2. Analysis

¶ 42 We discern no error in the trial court's admission of the recorded interview between Tapia and Detective Crider. We have previously concluded that Tapia was not too intoxicated earlier in the evening to knowingly and intelligently waive his *Miranda* rights. There was no evidence that Tapia consumed additional alcohol thereafter. We note that during the Crider interrogation, Tapia showed less energy and was possibly sleeping when Crider entered the room; however, that alone was not sufficient to conclude that Tapia was too intoxicated to proceed. Rather, the passage of nearly four hours between the Lombardi interrogation and the Crider interrogation, coupled with Tapia's answers and body language,

suggested that Tapia was less intoxicated when Crider interrogated him.

¶ 43 As it relates to Tapia's unconventional signature, that alone is not indicative of him being incapable of waiving his *Miranda* rights. Crider verified Tapia's signature, and — as discussed in more detail in Part IV.B.2 — the court received evidence of other instances in which Tapia added additional letters to his name, undermining his assertion that the additional letters suggested that he was incapable of knowingly or intelligently waiving his *Miranda* rights.

¶ 44 Based upon our independent review of the video of the Crider interrogation, Tapia's physical appearance, his responsiveness to Crider's questions, and the substantive and rational nature of his responses, we discern no error in the trial court's conclusion that Tapia knowingly and intelligently waived his Miranda rights before speaking with Crider.

¶ 45 We also discern no error with the trial court's decision to deny defense counsel's motion to reconsider based on the newly submitted evidence of Tapia's BAC earlier in the evening. Counsel did not provide any justification for failing to present such evidence

at the motions hearing or adequately explain why the expert's report would have changed the outcome.

### III.   Right to Counsel of Choice

¶ 46    Tapia next contends that the trial court violated his constitutional right to counsel of his choosing by denying his motion to continue the trial.  We disagree.

### A.   Additional Facts

¶ 47    On the day of trial, Tapia orally moved for a continuance after stating that he had a "conflict of interest" with his defense counsel and that he was unhappy with his representation.  He also stated that he sought private counsel "a while ago" but had trouble gathering the necessary funds to retain counsel.  Upon learning about the asserted conflict, the trial judge arranged for a different judge to conduct a *Bergerud* hearing, and that judge found that there was no conflict.

¶ 48    After renewing the continuance motion, Tapia explained that he had spoken to Gary Fielder, a defense attorney, but that his family was still working to obtain the funds necessary to secure Fielder's services.  The court asked a series of follow-up questions including

- whether Fielder, who was not present in the courtroom, intended to show up at the trial on that day;

- whether Tapia had spoken to Fielder about how long it would take him to get up to speed on the case (Tapia indicated that he thought it would take approximately six months for Fielder to be ready for trial);

- whether Tapia paid Fielder any money;

- how much more the family needed to raise (Tapia indicated that the family had secured around 70% of the funds and that he was not sure how long it would take for his family to raise the remaining amount); and

- whether Tapia would have to re-retain the experts that current defense counsel had already retained for the trial.

¶ 49 The court noted that this was the second trial setting for the case and asked whether the prosecution objected to the continuance. The prosecutor objected due to the late nature of the request and argued that the factors articulated in *People v. Brown*, 2014 CO 25, weighed in favor of denying the continuance. Specifically, the prosecutor noted that Santos's family members had

flown in to watch the trial; that some of the witnesses were nervous, were scared, and had taken time off of work to testify; and that Santos's family objected to continuing the case.

¶ 50    After considering the *Brown* factors, the trial court denied Tapia's motion, finding that

- this was the second trial setting, and the case had been pending since April 2022;

- the judge who presided over the *Bergerud* hearing found that there was no conflict between Tapia and his current counsel;

- Tapia's counsel was ready for trial, whereas it would take Fielder between four and six months to be ready for trial; and

- Santos's family objected to the continuance, and some of his family members had flown in to watch the trial.

¶ 51    The court then stated,

> This sure strikes the [c]ourt as a request that is rooted in fear and nervousness and concern about being in trial on a Class 1 felony, which — you're right — could result in life in prison, if you're convicted.  It's normal for you to be scared and concerned and nervous.  Trial is a risky thing for everybody, for the district

attorney's side and for your side, but I can't delay the trial because of these uncertainties that you're having.  Your lawyers appear to be very prepared, and they have filed all of the motions and materials that I would expect in this kind of a case, if not more than I would have seen in the past.  I'm convinced that your request to continue should be denied, and I'm going to deny your request for the reasons I set forth.  We're going to have a trial this week, Mr. Tapia.

### B.    Standard of Review and Applicable Law

¶ 52    We review a trial court's denial of a motion to continue to retain counsel of choice for an abuse of discretion.  *Brown*, ¶ 19.

### 1.    The Right to Counsel of One's Own Choosing

¶ 53    The United States Constitution and Colorado Constitution afford a criminal defendant the right to be represented by counsel of their choice in state criminal prosecutions if the defendant faces incarceration.  *Ronquillo v. People*, 2017 CO 99, ¶ 15 (citing *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963)); *see* U.S. Const. amend. VI; Colo. Const. art. II, § 16.  The right to counsel of choice applies whenever a defendant seeks to hire private counsel.  *Ronquillo*, ¶ 20.  While a defendant's right to counsel of his choosing is "a crucially important consideration for the trial court," that right is not unlimited.  *Brown*, ¶ 22.

### 2. A Court's Discretion to Deny a Continuance Motion

¶ 54 When evaluating a continuance motion to retain counsel of defendant's choice, trial courts must balance that right against the nonexhaustive factors enumerated in *Brown*:

(1) the defendant's actions surrounding the request;

(2) the availability of chosen counsel;

(3) the length of continuance necessary to accommodate chosen counsel;

(4) the potential prejudice of a delay to the prosecution beyond mere inconvenience;

(5) the inconvenience to witnesses;

(6) the age of the case, both in the judicial system and from the date of the offense;

(7) the number of continuances already granted in the case;

(8) the timing of the request to continue;

(9) the impact of the continuance on the court's docket;

(10) the victim's position, if the victims' rights act applies; and

(11) any other case-specific factors necessitating or weighing against further delay.

*Id.* at ¶ 24.

## C. Analysis

¶ 55 While Tapia concedes that waiting until the day of trial to request this continuance weighed in favor of denying the motion, he argues that, looking at the *Brown* factors holistically, the trial court erroneously denied his motion. Tapia also specifically takes issue with the court's finding that his requested continuance was "rooted in fear and nervousness and concern about being in trial on a Class 1 felony . . . [and that] [i]t's normal for [Tapia] to be scared and concerned and nervous." Tapia argues that his fear was not due to the seriousness of the charges or the gravity of the situation but rather his anxiety about proceeding to trial represented by counsel that he did not feel comfortable with. This type of anxiety, Tapia argues, emanates from being denied the right to counsel of choice, and the corresponding confidence in a chosen attorney that falls within Sixth Amendment protection.

¶ 56 The People respond that the trial court properly denied the last-minute continuance request based on the *Brown* factors. We agree with the People.

¶ 57 As it relates to the first factor — Tapia's motive — we discern no error in the trial court's finding that Tapia acted out of fear. It

24

was the first time that the court had been made aware of any issues concerning his representation by the public defenders, and the court that conducted the *Bergerud* hearing found no conflict. Therefore, contrary to Tapia's assertion on appeal, there was record support for the trial court's finding that the continuance motion was actually based on fears inherent in proceeding to trial on a class 1 felony rather than a lack of confidence in or conflict with his appointed counsel. This finding works against Tapia's continuance motion under the first *Brown* factor.

¶ 58 As it relates to *Brown* factors two through five, which largely deal with the administrative and logistical considerations of granting a continuance, the trial court properly considered the consequences of any continuance, including asking how long it would take for Tapia's family to come up with funds to retain Fielder, how far along in the process the family was in securing the representation, how long it would take Fielder — once retained — to be prepared for a trial, and the potential costs associated with having to re-retain experts for a new trial date.

¶ 59 The court also considered other factors before deciding whether to grant the continuance, such as the number of

continuances previously granted (the trial had already been continued twice); the impact on the court's docket; and the burdens a continuance would place on witnesses, including a finding that there were witnesses who had expressed nervousness about testifying in this case and had taken time off of work.

¶ 60    Finally, the court considered the objections made by Santos's family members, including those who had flown to Colorado to be present for the trial.

¶ 61    Given the court's consideration of the *Brown* factors and its related findings, we conclude the court did not abuse its discretion by denying Tapia's motion to continue.

IV.    The Unfairly Prejudicial Evidence Claims

¶ 62    Tapia contends that the trial court reversibly erred by admitting (1) bodycam footage that graphically depicted Santos's injuries and (2) an unredacted image of Tapia's Facebook profile which used the name "Smith Wessøn (vmøneyy)." We address each contention in turn.

A.    Standard of Review and Applicable Law

¶ 63    We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Elmarr*, 2015 CO 53, ¶ 20.

26

¶ 64    Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Relevant evidence is admissible unless its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403.

¶ 65    Under Rule 403, a reviewing court is obligated to "afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002). Images may be admissible in evidence if "they depict relevant facts and are not unnecessarily gruesome and inflammatory so as to incite the jury to unfair prejudice against the defendant." *People v. Herrera*, 2012 COA 13, ¶ 30 (explaining that photographs depicting a victim at the scene of a crime are admissible if they depict relevant facts). Moreover, "photographs of a victim may have probative value even if they relate to an undisputed matter." *Id.* at ¶ 32; *see People v. White*, 606 P.2d 847, 849 (Colo. 1980) ("[P]hotographs are not

27

inadmissible solely because the defendant has stipulated to these matters, or because these matters have been established through the testimony of prosecution witnesses.").

## B.    Discussion

### 1.    Officer Brown's Bodycam Footage

¶ 66    Tapia contends that the footage from the bodycam worn by Officer Phillip Brown, a police officer who reported to the scene of the shooting and tended to Santos's injuries, should have been excluded because the prejudicial impact of the video outweighed its probative value.  We are not persuaded.

#### a.    Additional Facts

¶ 67    The video, which is a little shy of five minutes, shows Officer Brown running toward an apparently unconscious and bleeding Santos, as Lara-Tello applies pressure to Santos's neck wound.  The footage shows Martinez describing Tapia's clothing to nearby officers and Brown cutting off Santos's shirt to inspect his body for additional injuries.  Significant amounts of blood appear on Santos's face and upper body.  The footage also shows paramedics placing Santos on a gurney and into an ambulance.

¶ 68   At trial, the prosecution moved to admit Officer Brown's bodycam footage. Tapia's counsel objected on relevance grounds and argued that the extremely bloody content of the video was unduly prejudicial. The prosecution responded that the footage was relevant to show the condition of the scene and would assist the eyewitnesses' explanations of what happened.

¶ 69   After finding that the footage was "relevant to show the condition of the scene, the chaotic nature of the scene, [and] to show timing issues," the trial court admitted the video but only allowed the prosecution to play it for the jury once. The court also warned members of the public that the video was disturbing prior to playing it. The prosecutor played the video.

### b.   Analysis

¶ 70   Tapia contends that the video was unduly prejudicial and had scant probative value. Tapia cites the court's disclaimer to the public about the graphic content of the video to demonstrate its prejudice. Because other evidence was available to convey the same information — such as testimony from Officer Brown, Lara-Tello, and Martinez — as well as less prejudicial autopsy photos, Tapia argues the court abused its discretion by admitting the video.

¶ 71 The People counter that the trial court properly admitted the bodycam footage because the evidence was relevant and not unfairly prejudicial. They emphasize that the bar for relevance is low, *see* CRE 401, and under CRE 403 the objecting party must demonstrate that the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice." The People argue the footage showed the position of Martinez and Lara-Tello and the condition of the scene when officers arrived.

¶ 72 The People also reject Tapia's contention that the footage was unduly prejudicial under CRE 403 because it was the only exhibit that the prosecution offered depicting Santos's injuries at the scene of the shooting, and autopsy photos would not show the relevant appearance and condition of Santos as effectively. We agree with the People.

¶ 73 Contrary to Tapia's assertion, the bodycam footage is relevant because it contextualizes the witnesses' testimony and shows the extent of Santos's injuries. Tapia also asserted that Santos's injuries were survivable; therefore, seeing the extent of those injuries and Santos's condition was relevant information for the jury to consider. *See People v. Kurts*, 721 P.2d 1201, 1204 (Colo.

App. 1986) ("Photographs depicting the circumstances surrounding the victim's death, such as the appearance of the victim and the location and nature of the wounds, have probative value in a homicide case.").

¶ 74    We also reject Tapia's contention that the nature of the video is presumptively prejudicial. When determining whether evidence should be excluded, courts must consider whether it depicts "relevant facts and [is] not unnecessarily gruesome and inflammatory so as to incite the jury to unfair prejudice against the defendant." *Herrera,* ¶ 30.

¶ 75    The video of Santos was relatively short, was only shown once, and did not depict an excessive amount of violence. As Tapia notes, the video depicts Santos's response to a lethal wound and the resulting blood loss. But because this case concerned a homicide caused by a gunshot wound to the neck, the jury already had context for the video given the significance of the charges and the nature of the crime.

¶ 76    Beyond the blood and a momentary look at Santos's gunshot wound, the video contained nothing that was unduly disturbing. Because the bodycam footage was both relevant and not unfairly

prejudicial, the trial court did not abuse its discretion by admitting it.  *See* CRE 401; CRE 403.

¶ 77    We also reject Tapia's assertion that the bodycam footage should have been excluded as cumulative simply because witnesses had described the events depicted in the video.  Tapia asserts that the witnesses' testimony was less prejudicial and that the video's prejudice is amplified because it was cumulative.  But as the People note, evidence is not rendered inadmissible simply because it may be cumulative in some respects.  *See People v. Pahlavan*, 83 P.3d 1138, 1140 (Colo. App. 2003).

¶ 78    The bodycam footage provided the jury with details concerning the gravity of Santos's wound, his condition in real time, and the positioning of witnesses, all of which are relevant and not wholly duplicative of the witnesses' testimony.  *See Young v. People*, 488 P.2d 567, 574 (Colo. 1971) ("[P]hotographs may be used to graphically portray, among other things, the scene of a crime, the identification of a victim, the appearance and condition of the deceased, and the location, nature and extent of the wounds or injuries, all of which matters are relevant.").

## 2. Tapia's Facebook Profile

¶ 79 Tapia contends that admitting a photograph depicting his unredacted Facebook profile picture and name, "Smith Wessøn (vmøneyy)," was unfairly prejudicial because the photograph contained little to no probative value under CRE 401 and was unfairly prejudicial under CRE 403 due to the reference to the name of a gun manufacturer. We are not persuaded.

¶ 80 The picture of Tapia's profile was relevant because (1) it corroborated Martinez's identification of him as the shooter; (2) Tapia raised the profile in his interview with Detective Crider and discussed how it was the primary way in which he connected with Santos; and (3) it established how Tapia sometimes used extra letters and symbols when identifying himself. Thus, the trial court did not err by concluding that the picture of the profile and name was relevant.

¶ 81 As it relates to the trial court's specific decision not to redact his profile name, we also discern no abuse of discretion. The profile name "Smith Wessøn (vmøneyy)" was relevant because it corroborated that Tapia's writing routinely included unnecessary Xs and Ys.

¶ 82    Furthermore, nothing in the picture of the profile impermissibly suggested that Tapia had a violent character.  The profile contained images of a middle-aged man, presumably Tapia's father, along with Tapia taking a selfie in a mirror.  None of this content depicted guns or created undue prejudice against Tapia.  Because it was relevant, and not unreasonably prejudicial under Rule 403, the trial court did not abuse its discretion by admitting the unredacted image of Tapia's Facebook profile.

## V.    The Jury Instructions

¶ 83    Tapia contends that the trial court erred by failing to instruct the jury on ordinary force and by modifying his tendered theory of defense instruction.  We address each contention in turn.

### A.    Standard of Review

¶ 84    A trial court has a duty to properly instruct the jury on the applicable law.  *People v. Claycomb*, 2025 COA 36, ¶ 14.  We review de novo whether the trial court's instructions, read as a whole, correctly informed the jury on the controlling law.  *Tibbels v. People*, 2022 CO 1, ¶ 22.  We also review de novo whether there was sufficient evidence to support a defendant's claimed affirmative defense.  *Pearson v. People*, 2022 CO 4, ¶ 16.  Generally, assuming

34

that the jury instructions accurately reflect the controlling law, we review "a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion." *People v. Payne*, 2019 COA 167, ¶ 16.

B.    Ordinary Force Instruction

¶ 85    Tapia contends that the trial court reversibly erred by impermissibly lowering the prosecution's burden of proof by failing to instruct the jury on the affirmative defense of ordinary physical force. We disagree.

1.    Applicable Law

¶ 86    "In order to present an affirmative defense for the jury to consider, a defendant must offer 'some credible evidence' to support the claimed defense." *Pearson*, ¶ 16 (quoting § 18-1-407(1), C.R.S. 2025). If the defendant meets that standard, but the trial court fails to instruct the jury concerning the affirmative defense, then the prosecution's burden of proof has been impermissibly lowered, and the defendant's constitutional rights are implicated. *Id.* When reviewing an affirmative defense instruction, appellate courts must review the evidence in the light most favorable to the defendant.

*People v. Newell,* 2017 COA 27, ¶ 19 (citing *Cassels v. People,* 92 P.3d 951, 955 (Colo. 2004)).

¶ 87    A person may use "physical force upon another person in order to defend himself . . . from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose." § 18-1-704(1), C.R.S. 2025.

¶ 88    Deadly physical force "means force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death." § 18-1-901(3)(d), C.R.S. 2025. Deadly physical force is only permitted upon a showing that a lesser degree of force would be inadequate. § 18-1-704(2)(a). It is not error for a court to refuse to instruct the jury on the affirmative defense of ordinary physical force in instances where there was "no evidence from which the jury could have found that the defendant's use of physical force upon the victim was anything other than deadly physical force." *People v. Opana,* 2017 CO 56, ¶ 17.

## 2.    Analysis

¶ 89    At trial, defense counsel requested a jury instruction on both ordinary physical force and deadly physical force.  The court permitted the jury to be instructed on deadly physical force but declined to instruct the jury on ordinary physical force after finding that, under *Opana*, the facts did not warrant an instruction on ordinary physical force due to Tapia's admission that he had a .38 caliber handgun, pointed it at Santos, and pulled the trigger twice within close range.

¶ 90    Tapia contends that the trial court's failure to instruct the jury on ordinary physical force impermissibly lowered the prosecution's burden of proof because (1) the facts in this case were distinguishable from *Opana*, and (2) there was sufficient evidence to support an ordinary physical force jury instruction because there was some evidence to support Tapia's theory of defense that the amount of force he used would not normally be expected to cause Santos's death.  Specifically, Tapia argues that it was heavily disputed at trial whether his actions amounted to deadly physical force given the bullet's trajectory, his extreme intoxication, and the

37

fact that Santos's injuries were arguably survivable if he had received immediate medical attention.

¶ 91    The People counter that the trial court properly denied the ordinary physical force instruction as Tapia was not entitled to such an instruction because there was no evidence that he acted with anything but deadly physical force.  *See id.*  We agree with the People.

¶ 92    We are not persuaded by Tapia's effort to distinguish *Opana.* True, as Tapia points out, the defendant in *Opana* did not ask for an ordinary physical force jury instruction, and therefore the supreme court reviewed for plain error.  *See id.* at ¶ 1.  And equally true, Tapia requested an ordinary physical force instruction and therefore preserved the issue.  But the question of preservation does not impact the ultimate legal rule articulated in *Opana* — that is, a defendant who uses lethal force by shooting someone at close range with a firearm is not entitled to an ordinary force affirmative defense instruction.  *Id.* at ¶ 17 ("[T]here was no evidence from which the jury could have found that the defendant's use of physical force . . . was anything other than deadly physical force. . . .  [The defendant]

shot the victim in the chest, at close range, with a large caliber firearm.").

¶ 93    "While the threshold for entitlement to an instruction on an affirmative defense is low, it is not negligible." *Id.*  In order for a jury to be instructed on an affirmative defense, there must be some evidence to support the instruction.  *Pearson*, ¶ 16.  Tapia argues that because it was disputed whether Santos's injuries were survivable and whether Tapia understood his actions when he shot Santos, an ordinary physical force instruction was appropriate. However, that is not where the analysis ends.

¶ 94    There is nothing in the statute governing the use of physical force that allows a defendant's motives or mental state to presumptively or expressly require a court to issue an ordinary physical force instruction.  *See* § 18-1-704.  Rather, the statute refers to the perceptions of a reasonable person.  *Id.*  Consequently, the fact that Tapia's motives and his mental capabilities at the time of the shooting were heavily litigated did not entitle him to an ordinary physical force instruction.

¶ 95    As it relates to Tapia's second argument, that an ordinary physical force instruction was warranted because there was some

evidence to support the instruction, we are, again, not persuaded. Deadly physical force is that force "the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death." § 18-1-901(3)(d). A probable consequence of firing multiple shots from a .38 caliber revolver at someone at close range is death. And, as the trial court noted, there was nothing in the record suggesting that Tapia used lesser force prior to firing the gun at Santos. Thus, the trial court did not abuse its discretion by denying Tapia's tendered ordinary physical force instruction.

## C. Theory of the Defense

¶ 96    Tapia also contends that the trial court reversibly erred by failing to adopt his unedited theory of defense instruction. We discern no error.

### 1. Applicable Law

¶ 97    "We review a trial court's decision to modify a tendered theory of defense instruction for an abuse of discretion." *People v. Martinez*, 2020 COA 141, ¶ 79.

## 2.    Analysis

¶ 98    Defense counsel tendered the following theory of defense instruction:

> Mr. Tapia asserts that he did not intend to kill Mr. Santos.  He asserts that he was intoxicated to such a degree that he could not act with deliberation or premeditation.  Further, based on his perceptions of the circumstances, he was acting in self-defense when he fired the gun and did not mean to hit him.

¶ 99    The trial court modified the instruction as follows:

> Mr. Tapia asserts that he did not intend to kill Mr. Santos.  He asserts that he was intoxicated to such a degree that he could not act with deliberation ~~or premeditation~~.  ~~Further, based on his perceptions of the circumstances,~~ He *asserts* he was acting in self-defense when he fired the gun ~~and did not mean to hit him~~.

(Additions are shown in italics and deletions are shown in strikethroughs.)  Tapia contends that the deletions resulted in error because the omissions undermined his theory of defense, which was that he did not mean to hit Santos when he fired the gun.  He further reasons that the instruction was warranted because there was evidence that Tapia fired the gun twice, but Santos's wounds were only caused by one bullet.

41

¶ 100 The People counter that the trial court acted within its discretion by modifying Tapia's tendered instruction because there was no evidence of the trajectory of the second round, only that one of the bullets did not hit Santos. The People also argue that the trial court was not required to include the language that Tapia did not mean to hit Santos because other instructions ensured that Tapia "could not be convicted of the charge if the shooting were accidental," and the jury was properly instructed on the elements of murder and the lesser included offenses.

¶ 101 We conclude that the trial court did not abuse its discretion by modifying Tapia's theory of defense instruction. The court's modified instruction correctly advised the jury of the law and struck the balance between Tapia's affirmative assertion that he did not intentionally kill Santos and not impermissibly weighing in on the evidence. Because the modified theory of defense instruction accurately described Tapia's theory of the case and explained the law to the jury, we discern no error.

## VI. Cumulative Error

¶ 102 Finally, Tapia contends that the cumulative impact of the asserted errors requires reversal. "The doctrine of cumulative error

42

is based on the notion that multiple errors, in isolation, may be viewed as harmless, but the synergistic effect of the multiple errors may be so prejudicial that they deprive a defendant of a fair trial." *People v. Serna-Lopez*, 2023 COA 21, ¶ 47. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Because we have found no error, Tapia's cumulative error claim necessarily fails.

## VII. Disposition

¶ 103 The judgment is affirmed.

JUDGE FREYRE and JUDGE BROWN concur.